ROWAN, DBA AMERICAN BOOK SERVICE, ET AL. v.
UNITED STATES POST OFFICE
DEPARTMENT ET AL.

No. 399.   Argued January 22, 1970—Decided May 4, 1970

*Joseph Taback* argued the cause and filed a brief for appellants.

*Assistant Attorney General Ruckelshaus* argued the cause for appellees. With him on the brief were *Solicitor General Griswold, Peter L. Strauss, Robert V. Zener,* and *Donald L. Horowitz.*

*Louis J. Lefkowitz,* Attorney General, *pro se, Samuel A. Hirshowitz,* First Assistant Attorney General, and *Lloyd G. Milliken* filed a brief for the Attorney General of New York as *amicus curiae* urging affirmance. *David E. McGiffert* filed a brief for the Direct Mail Advertising Association, Inc., as *amicus curiae.*

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

Appellants challenge the constitutionality of Title III of the Postal Revenue and Federal Salary Act of 1967, 81 Stat. 645, 39 U. S. C. § 4009 (1964 ed., Supp. IV), under which a person may require that a mailer remove his name from its mailing lists and stop all future mailings to the householder. The appellants are publishers, distributors, owners, and operators of mail order houses, mailing list brokers, and owners and operators of mail service organizations whose business activities are affected by the challenged statute.

A brief description of the statutory framework will facilitate our analysis of the questions raised in this appeal. Section 4009 is entitled "Prohibition of pandering advertisements in the mails." It provides a pro-

cedure whereby any householder may insulate himself from advertisements that offer for sale "matter which the addressee in his sole discretion believes to be erotically arousing or sexually provocative." 39 U. S. C. § 4009 (a) (1964 ed., Supp. IV).[1]

Subsection (b) mandates the Postmaster General, upon receipt of a notice from the addressee specifying that he has received advertisements found by him to be within the statutory category, to issue on the addressee's request an order directing the sender and his agents or assigns to refrain from further mailings to the named addressee. Additionally, subsection (c) requires the Postmaster General to order the affected sender to delete the name of the designated addressee from all mailing lists owned or controlled by the sender and prohibits the sale, rental, exchange, or other transactions involving mailing lists bearing the name of the designated addressee.

If the Postmaster General has reason to believe that an order issued under this section has been violated, subsection (d) authorizes him to notify the sender by registered or certified mail of his belief and the reasons therefor, and grant him an opportunity to respond and have a hearing on whether a violation has occurred.

If the Postmaster General thereafter determines that the order has been or is being violated, he is authorized to request the Attorney General to seek an order from a United States District Court directing compliance with the prohibitory order. Subsection (e) grants to the district court jurisdiction to issue a compliance order upon application of the Attorney General.

Appellants initiated an action in the United States District Court for the Central District of California upon

[1] Subsection (g) provides that upon the addressee's request the order shall include the names of the addressee's minor children who reside with him and who have not attained their nineteenth birthday.

a complaint and petition for declaratory relief on the ground that 39 U. S. C. § 4009 (1964 ed., Supp. IV) is unconstitutional. They alleged that they had received numerous prohibitory orders pursuant to the provisions of the statute. Appellants contended that the section violates their rights of free speech and due process guaranteed by the First and Fifth Amendments to the United States Constitution. Additionally, appellants argued that the section is unconstitutionally vague, without standards, and ambiguous.

A three-judge court was convened pursuant to 28 U. S. C. § 2284 and it determined that the section was constitutional when interpreted to prohibit advertisements similar to those initially mailed to the addressee.[2] 300 F. Supp. 1036.

The District Court construed subsections (b) and (c) to prohibit "advertisements similar" to those initially mailed to the addressee. Future mailings, in the view of the District Court, "are to be measured by the objectionable material of such first mailing." 300 F. Supp., at 1041. In our view Congress did not intend so restrictive a scope to those provisions.

## I. BACKGROUND AND CONGRESSIONAL OBJECTIVES

Section 4009 was a response to public and congressional concern with use of mail facilities to distribute unsolicited advertisements that recipients found to be offensive because of their lewd and salacious character. Such mail was found to be pressed upon minors as well as adults who did not seek and did not want it. Use of mailing lists of youth organizations was part of the mode of

---

[2] Judge Hufstedler, concurring specially but without dissent, would require the District Court prior to issuing a compliance order to determine de novo whether the sender is a person who has mailed or has caused to be mailed any pandering advertisements.

doing business. At the congressional hearings it developed that complaints to the Postmaster General had increased from 50,000 to 250,000 annually. The legislative history, including testimony of child psychology specialists and psychiatrists before the House Committee on the Post Office and the Civil Service, reflected concern over the impact of the materials on the development of children. A declared objective of Congress was to protect minors and the privacy of homes from such material and to place the judgment of what constitutes an offensive invasion of those interests in the hands of the addressee.

To accomplish these objectives Congress provided in subsection (a) that the mailer is subject to an order "to refrain from further mailings of such materials to designated addressees." Subsection (b) states that the Postmaster General shall direct the sender to refrain from "further mailings to the named addressees." Subsection (c) in describing the Postmaster's order states that it shall "expressly prohibit the sender . . . from making any further mailings to the designated addressees . . . ." Subsection (c) also requires the sender to delete the addressee's name "from all mailing lists" and prohibits the sale, transfer, and exchange of lists bearing the addressee's name.

There are three plausible constructions of the statute, with respect to the scope of the prohibitory order. The order could prohibit all future mailings to the addressees, all future mailings of advertising material to the addressees, or all future mailings of similar materials.

The seeming internal statutory inconsistency is undoubtedly a residue of the language of the section as it was initially proposed. The section as originally reported by the House Committee prohibited "further mailings of such pandering advertisements," § 4009 (a), "further mailings of such matter," § 4009 (b), and "any further mailings of pandering advertisements," § 4009 (c).

H. R. Rep. No. 722, 90th Cong., 1st Sess., 125 (1967). The section required the Postmaster General to make a determination whether the particular piece of mail came within the proscribed class of pandering advertisements, "as that term is used in the *Ginzburg* case." *Id.,* at 69.

The section was subsequently amended by the House of Representatives to eliminate from the Post Office any censorship function. Congressman Waldie, who proposed the amendment, envisioned a minimal role for the Post Office. The amendment was intended to remove "the right of the Government to involve itself in any determination of the content and nature of these objectionable materials . . . ." 113 Cong. Rec. 28660 (1967). The only determination left for the Postmaster General is whether or not the mailer has removed the addressee's name from the mailing list. Statements by the proponents of the legislation in both the House and Senate manifested an intent to prohibit all further mailings from the sender. In describing the effect of his proposed amendment Congressman Waldie stated:

> "So I have said in my amendment that if you receive literature in your household that you consider objectionable . . . you can inform the Postmaster General to have your name stricken from that mailer's mailing list." 113 Cong. Rec. 28660.

The Senate Committee Report on the bill contained similar language:

> "If a person receives an advertisement which . . . he . . . believes to be erotically arousing . . . he may notify the Postmaster General of his determination. The Postmaster General is then required to issue an order to the sender directing him to refrain from sending any further mailings of any kind to such person." S. Rep. No. 801, 90th Cong., 1st Sess., 38.

Senator Monroney, a major proponent of the legislation in the Senate, described the bill as follows:

"With respect to the test contained in the bill, if the addressee declared it to be erotically arousing or sexually provocative, the Postmaster General would have to notify the sender to send no more mail to that address . . . ." 113 Cong. Rec. 34231 (1967).[3]

The legislative history of subsection (a) thus supports an interpretation that prohibits all future mailings independent of any objective test. This reading is consistent with the provisions of related subsections in the section. Subsection (c) provides that the Postmaster General "shall also direct the sender and his agents or assigns to delete immediately the names of the designated addressees from all mailing lists owned or controlled by the sender or his agents or assigns and, further, shall prohibit the sender and his agents or assigns from the sale, rental, exchange, or other transaction involving mailing lists bearing the names of the designated addressees." 39 U. S. C. § 4009 (c) (1964 ed., Supp. IV).

It would be anomalous to read the statute to affect only similar material or advertisements and yet require the Postmaster General to order the sender to remove the addressee's name from all mailing lists in his actual or constructive possession. The section was intended to allow the addressee complete and unfettered discretion in electing whether or not he desired to receive further material from a particular sender. See n. 6, *infra*. The impact of this aspect of the statute is on the mailer, not

---

[3] Senator Hruska spoke similarly: "Title III would allow the recipient of obscene mail to return it to the Postmaster General with a request that the Postmaster General notify the sender to stop mailings to the addressee . . . ." 113 Cong. Rec. 34232 (1967).

the mail. The interpretation of the statute that most completely effectuates that intent is one that prohibits any further mailings. Limiting the prohibitory order to similar materials or advertisements is open to at least two criticisms: (a) it would expose the householder to further burdens of scrutinizing the mail for objectionable material and possible harassment, and (b) it would interpose the Postmaster General between the sender and the addressee and, at the least, create the appearance if not the substance of governmental censorship.[4] It is difficult to see how the Postmaster General could decide whether the materials were "similar" or possessing touting or pandering characteristics without an evaluation suspiciously like censorship. Additionally, such an interpretation would be incompatible with the unequivocal language in subsection (c).

## II. FIRST AMENDMENT CONTENTIONS

The essence of appellants' argument is that the statute violates their constitutional right to communicate. One sentence in appellants' brief perhaps characterizes their entire position:

> "The freedom to communicate orally and by the written word and, indeed, in every manner whatsoever is imperative to a free and sane society." Brief for Appellants 15.

---

[4] Subsection (d) vests the Postmaster General with the duty to determine whether the sender has violated the order. This determination was intended to be primarily a ministerial one involving an adjudication whether the initial material was an advertisement and whether the sender mailed materials to the addressee more than 30 days after the receipt of the prohibitory order. An interpretation which requires the Postmaster General to determine whether the subsequent material was pandering and/or similar would tend to place him "astride the flow of mail . . . ." *Lamont* v. *Postmaster General*, 381 U. S. 301, 306 (1965).

Without doubt the public postal system is an indispensable adjunct of every civilized society and communication is imperative to a healthy social order. But the right of every person "to be let alone" must be placed in the scales with the right of others to communicate. ✦

In today's complex society we are inescapably captive audiences for many purposes, but a sufficient measure of individual autonomy must survive to permit every householder to exercise control over unwanted mail. To make the householder the exclusive and final judge of what will cross his threshold undoubtedly has the effect of impeding the flow of ideas, information, and arguments that, ideally, he should receive and consider. Today's merchandising methods, the plethora of mass mailings subsidized by low postal rates, and the growth of the sale of large mailing lists as an industry in itself have changed the mailman from a carrier of primarily private communications, as he was in a more leisurely day, and have made him an adjunct of the mass mailer who sends unsolicited and often unwanted mail into every home. It places no strain on the doctrine of judicial notice to observe that whether measured by pieces or pounds, Everyman's mail today is made up overwhelmingly of material he did not seek from persons he does not know. And all too often it is matter he finds offensive.

In *Martin* v. *Struthers,* 319 U. S. 141 (1943), Mr. Justice Black, for the Court, while supporting the "[f]reedom to distribute information to every citizen," *id.,* at 146, acknowledged a limitation in terms of leaving "with the homeowner himself" the power to decide "whether distributors of literature may lawfully call at a home." *Id.,* at 148. Weighing the highly important right to communicate, but without trying to determine where it fits into constitutional imperatives, against the very basic right to be free from sights, sounds, and tangible matter we do not want, it seems to us that a mailer's

right to communicate must stop at the mailbox of an unreceptive addressee.

The Court has traditionally respected the right of a householder to bar, by order or notice, solicitors, hawkers, and peddlers from his property. See *Martin* v. *Struthers, supra;* cf. *Hall* v. *Commonwealth,* 188 Va. 72, 49 S. E. 2d 369, appeal dismissed, 335 U. S. 875 (1948). In this case the mailer's right to communicate is circumscribed only by an affirmative act of the addressee giving notice that he wishes no further mailings from that mailer.

To hold less would tend to license a form of trespass and would make hardly more sense than to say that a radio or television viewer may not twist the dial to cut off an offensive or boring communication and thus bar its entering his home. Nothing in the Constitution compels us to listen to or view any unwanted communication, whatever its merit; we see no basis for according the printed word or pictures a different or more preferred status because they are sent by mail. The ancient concept that "a man's home is his castle" into which "not even the king may enter" has lost none of its vitality, and none of the recognized exceptions includes any right to communicate offensively with another. See *Camara* v. *Municipal Court,* 387 U. S. 523 (1967).

Both the absoluteness of the citizen's right under § 4009 and its finality are essential; what may not be provocative to one person may well be to another. In operative effect the power of the householder under the statute is unlimited; he may prohibit the mailing of a dry goods catalog because he objects to the contents—or indeed the text of the language touting the merchandise. Congress provided this sweeping power not only to protect privacy but to avoid possible constitutional questions that might arise from vesting the power to make any discretionary evaluation of the material in a governmental official.

In effect, Congress has erected a wall—or more accurately permits a citizen to erect a wall—that no advertiser may penetrate without his acquiescence. The continuing operative effect of a mailing ban once imposed presents no constitutional obstacles; the citizen cannot be put to the burden of determining on repeated occasions whether the offending mailer has altered its material so as to make it acceptable. Nor should the householder have to risk that offensive material come into the hands of his children before it can be stopped.

We therefore categorically reject the argument that a vendor has a right under the Constitution or otherwise to send unwanted material into the home of another. If this prohibition operates to impede the flow of even valid ideas, the answer is that no one has a right to press even "good" ideas on an unwilling recipient. That we are often "captives" outside the sanctuary of the home and subject to objectionable speech and other sound does not mean we must be captives everywhere. See *Public Utilities Comm'n* v. *Pollak,* 343 U. S. 451 (1952). The asserted right of a mailer, we repeat, stops at the outer boundary of every person's domain.

The statutory scheme at issue accords to the sender an "opportunity to be heard upon such notice and proceedings as are adequate to safeguard the right for which the constitutional protection is invoked." *Anderson Nat. Bank* v. *Luckett,* 321 U. S. 233, 246 (1944). It thus comports with the Due Process Clause of the Fifth Amendment. The statutory scheme accomplishes this by providing that the Postmaster General shall issue a prohibitory order to the sender on the request of the complaining addressee. Only if the sender violates the terms of the order is the Postmaster General authorized to serve a complaint on the sender, who is then allowed 15 days to respond. The sender can then secure an

administrative hearing.[5]  The sender may question whether the initial material mailed to the addressee was an advertisement and whether he sent any subsequent mailings.  If the Postmaster General thereafter determines that the prohibitory order has been violated, he is authorized to request the Attorney General to make application in a United States District Court for a compliance order;[6] a second hearing is required if an order is to be entered.

The only administrative action not preceded by a full hearing is the initial issuance of the prohibitory order.  Since the sender risks no immediate sanction by failing to comply with that order—it is only a predicate for later steps—it cannot be said that this aspect of the procedure denies due process.  It is sufficient that all available defenses, such as proof that no mail was sent, may be presented to a competent tribunal before a contempt finding can be made.  See *Nickey* v. *Mississippi,* 292 U. S. 393, 396 (1934).

---

[5] Although subsection (h) specifically excludes the pre-complaint hearing from the provisions of the Administrative Procedure Act, 5 U. S. C. § 554 *et seq.* (1964 ed., Supp. IV), the Post Office Department has promulgated regulations setting forth procedures governing the departmental administrative hearings.  39 CFR pt. 916.

[6] The function of the district court is similar to that of the Postmaster General.  It is to determine whether the initial mailing included advertising material and whether there was a mailing by the sender to the addressee more than 30 days after receipt of the order.  We reject the suggestions that the section should be read to require the district judge to make a determination of the addressee's good faith, or to conduct an independent adjudication of the pandering nature of the material.  The statute was intended to entrust unreviewable discretion to the addressee to determine whether or not the advertisement was "erotically arousing or sexually provocative."  "[T]he sole determination as to whether the literature you receive is objectionable or not is within your discretion and you are not second-guessed on that discretion."  113 Cong. Rec. 28660 (1967) (remarks of Congressman Waldie).

The appellants also contend that the requirement that the sender remove the addressee's name from all mailing lists in his possession violates the Fifth Amendment because it constitutes a taking without due process of law. The appellants are not prohibited from using, selling, or exchanging their mailing lists; they are simply required to delete the names of the complaining addressees from the lists and cease all mailings to those persons.

Appellants next contend that compliance with the statute is confiscatory because the costs attending removal of the names are prohibitive. We agree with the conclusion of the District Court that the "burden does not amount to a violation of due process guaranteed by the Fifth Amendment of the Constitution. Particularly when in the context presently before this Court it is being applied to commercial enterprises." 300 F. Supp., at 1041. See *California State Auto Ins. Bureau v. Maloney,* 341 U. S. 105 (1951).

There is no merit to the appellants' allegations that the statute is unconstitutionally vague. A statute is fatally vague only when it exposes a potential actor to some risk or detriment without giving him fair warning of the nature of the proscribed conduct. *United States* v. *Cardiff,* 344 U. S. 174, 176 (1952). Here the appellants know precisely what they must do on receipt of a prohibitory order. The complainants' names must be removed from the sender's mailing lists and he must refrain from future mailings to the named addressees. The sender is exposed to a contempt sanction only if he continues to mail to a particular addressee after administrative and judicial proceedings. Appellants run no substantial risk of miscalculation.

For the reasons stated, the judgment appealed from is affirmed.

*It is so ordered.*

MR. JUSTICE BRENNAN, with whom MR. JUSTICE DOUGLAS joins, concurring.

I join the Court's opinion but add a few words. I agree that 39 U. S. C. § 4009 (1964 ed., Supp. IV) is constitutional insofar as it permits an *addressee* to require a mailer to remove *his* name from its mailing lists and to stop all future mailings to the addressee. As the Court notes, however, subsection (g) of § 4009 also allows an addressee to request the Postmaster General to include in any prohibitory order "the names of any of his minor children who have not attained their nineteenth birthday, and who reside with the addressee." In light of the broad interpretation that the Court assigns to § 4009, and see *ante,* at 738, the possibility exists that parents could prevent their children, even if they are 18 years old, from receiving political, religious, or other materials that the parents find offensive. In my view, a statute so construed and applied is not without constitutional difficulties. Cf. *Tinker* v. *Des Moines School Dist.,* 393 U. S. 503 (1969); *Ginsberg* v. *New York,* 390 U. S. 629 (1968). In this case, however, there is no particularized attack upon the constitutionality of subsection (g), nor, indeed, is there any indication on this record that under § 4009 (g) children in their late teens have been unwillingly deprived of the opportunity to receive materials. In these circumstances, I understand the Court to leave open the question of the right of older children to receive materials through the mail without governmental interference and also the more specific question whether § 4009 (g) may constitutionally be applied with respect to *all* materials and to *all* children under 19.