PEOPLE *v.* HARRISON.
OPINION OF THE COURT.

1. TRESPASS—WARNING—REFUSAL TO LEAVE—COLLEGES AND UNIVER-
SITIES.

Conviction of defendants of trespassing and of violation of
Michigan State University Ordinance which prohibits assembly
of persons in a manner which obstructs the free and normal
use of university buildings was proper where defendants ob-
structed ingress and egress from booth at a career carnival
in the student union building and refused to comply with
an order by a university official having authority to do so
advising them that they were trespassing and requiring them
to cease the activities in which they were engaged and stop
obstructing the normal use of university facilities (CLS 1961,
§ 750.552, Michigan State University Ordinances § 16.01).

2. STATES—PROPERTY.

The state, no less than a private owner of property, has power
to preserve the property under its control for the use to which
it is lawfully dedicated.

3. CONSTITUTIONAL LAW—STATES—PROPERTY.

The United States Constitution does not forbid a state to control
the use of its own property for its own lawful and nondis-
criminatory purpose.

---

REFERENCES FOR POINTS IN HEADNOTES

[1–5, 7–11]  36 Am Jur, Mobs and Riots §§ 2–12.
12 Am Jur 2d, Breach of Peace and Disorderly Conduct §§ 6–12.
Participation of student in demonstration on or near campus
as warranting imposition of criminal liability for breach of
peace, disorderly conduct, trespass, unlawful assembly, or similar
offense. 32 ALR3d 551.
Participation of student in demonstration on or near campus as
warranting expulsion or suspension from school or college. 32
ALR3d 864.
[6]  21 Am Jur 2d, Criminal Law § 538.
Propriety of increased punishment on new trial for same offense.
12 ALR3d 978.

4. CONSTITUTIONAL LAW—FREE SPEECH—ASSEMBLY.

The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time (US Const, Ams 1, 14).

5. CONSTITUTIONAL LAW—FREE SPEECH—COLLEGES AND UNIVERSITIES —PROPERTY.

Pickets have no right to resist a state university's exercise of control over its property, to restrict its use for the purpose decided upon by the university, or to speak whenever, however, wherever, and to whomever they please in violation of directions not to do so by the owner or the public authority in control of the property where the attempt to speak is made (US Const, Ams 1, 14).

6. CRIMINAL LAW—APPEAL AND ERROR—CIRCUIT COURT—SENTENCE.

Circuit court's imposition, on appeal, of a harsher sentence than the previous one pronounced by a justice of the peace was not error.

CONCURRING OPINION.

T. E. BRENNAN, C. J., T. M. KAVANAGH, and ADAMS, JJ.

7. TRESPASS—NOTICE TO DEPART—COLLEGES AND UNIVERSITIES.

*An official of Michigan State University who had been assigned a certain portion of the student union building to conduct a career carnival and had it under his control, in accordance with a university policy of assigning parts of buildings to particular groups for specific uses, was qualified to give notice to trespassers to depart within the meaning of the statute punishing neglect or refusal to depart without lawful authority when given notice to depart by "the owner or occupant, the agent or servant of either" (MCLA § 750.552).*

8. CONSTITUTIONAL LAW—FREE SPEECH—RIGHT TO BE LET ALONE.

*Nothing in the Constitution compels one to listen to or view any unwanted communication and no one has the right to press ideas on an unwilling recipient (US Const, Am 1).*

9. CONSTITUTIONAL LAW—FREE SPEECH—CONFRONTATION—COERCION.

*Persons who sought to express their views in opposition to the view of others by a coerced confrontation did not act within the guarantee of the First Amendment (US Const, Am 1).*

10. CONSTITUTIONAL LAW—FREE SPEECH.

*Defendants sought a coerced confrontation, not a voluntary one, where the evidence is clear that they did not attend a career carnival at Michigan State University as students or guests who were interested in discussing careers with those who were assigned space at the carnival but for the purpose of expressing their views in opposition to other persons' views.*

CONCURRING OPINION.

T. E. BRENNAN, C. J., and T. M. KAVANAGH, J.

11. CONSTITUTIONAL LAW—FREE SPEECH.

*Actions of defendants, who did not attend a career carnival at Michigan State University as students or guests interested in discussing possible careers with those who had been assigned space at the carnival and sought not only to advance their view but to frustrate the free expression and dissemination of the view of recruiters at the carnival by attempting to use their claimed First Amendment rights in a manner that interfered with the rights of others, are not within the ambit of the First Amendment guarantee (US Const, Am 1).*

Appeal from Court of Appeals, Division 2, T. G. Kavanagh and Levin, JJ., reversing Ingham, Marvin J. Salmon, J., Quinn, P. J., dissenting. Submitted November 5, 1969. (Calendar No. 15, Docket No. 52,180.) Decided July 11, 1970.

13 Mich App 54, reversed.

Howard Harrison, Fred Warren Janvrin, James Phillip Dukarm, and Phillip Halprin were convicted of trespassing and assembling in a manner which obstructed the free and normal use of a building. Defendants appealed. Reversed by Court of Appeals. Plaintiff appeals. Reversed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Raymond L. Scodel-*

*ler,* Prosecuting Attorney, and *James R. Ramsey,* Assistant Prosecuting Attorney, for the people.

*Benjamin F. Gibson,* for defendants.

DETHMERS, J. Defendants were convicted in justice of the peace court for Lansing Township, Ingham County, and again, on appeal, in the Ingham County circuit court, of offenses charged in the complaint and warrant as consisting of:

"Count I
"being upon the lands or premises of another to-wit: Michigan State University Career Carnival being conducted on the second floor of the Student Union, Michigan State University, upon being notified to depart therefrom by an agent or servant of said Michigan State University to-wit: Jack Shingleton, Director of Michigan State University Placement Bureau, did without lawful authority neglect and refuse to depart therefrom contrary to compiled laws 1948 Sec. 750.552 [*sic*] being M.S.A. 28.820(1)
"Count II
"did then and there assemble at the career carnival at the Union Building of Michigan State University, with others, in a manner which obstructed the free and normal use of a university building and facility contrary to Section 16.01 Ordinance of Michigan State University adopted under the authority of Act 80 of Public Acts of 1905."

On appeal to the Court of Appeals it reversed the circuit court by split decision. The case is here on leave to appeal granted to plaintiff.

Michigan State University has a placement bureau which assists graduating seniors to obtain employment. Annually it sponsors a "Career Carnival" for the purpose of acquainting students with career opportunities. At the 1965 carnival 80 organizations or potential employers participated. To each an

exhibit location and space were assigned in the Union Building. All available space for that purpose was assigned to the 80 participants so that it was necessary to turn down applications from all who applied after that for exhibition space. Defendants did not apply for and were assigned no space. Persons working in the several exhibits were there to discuss with inquiring students the possibilities of employment in the business or activity represented and to advise as to courses of study in preparation therefor.

Among the exhibitors were the Michigan National Bank, the National Security Association and the Marine Corps. The booths of these three were in a row next to each other fronting on a common aisle, with the Marine Corps booth between the other two. There was also a narrow space between the booths to permit access into them from the aisle.

A large crowd attended the carnival and the area in front of the booths at times became crowded.

A number of members of the so-called Committee for Student Rights, including defendants, felt that the military occupation, as represented in the Marine Corps booth, was not a valid career. They gathered in a restaurant near the Union Building, equipped themselves with signs, posters and leaflets denouncing United States participation in the Viet Nam war and a large box with a sign stating that it was for contributions for "Medical Aid for the Viet Cong". They planned to picket the Marine Corps booth. They then went to the union, into the carnival area, and brought their above-mentioned articles and materials to the vicinity of the Marine Corps booth. One of their admitted purposes was to embarrass the military forces of the United States. As one of them testified, they were not interested in distributing their literature elsewhere

in the union because the object of their concern was the Marine Corps; they wanted to be right there at that booth and no place else. They crowded in front of that booth, held up their posters and the coin box with sign on it, and passed out their leaflets.

Employees of the exhibitors, who had the jobs of operating the booths of the Michigan National Bank and of the Marine Corps, testified that the defendants crowded into the narrow space between their two booths obstructing ingress and egress from the booths, crowded some of their materials into the bank booth and tended to block students who might wish to confer with the operators of these two booths from getting to the booths and having such conferences. They interfered with the operation of those booths. One of the men assigned to work in the Marine Corps booth testified that defendants impeded the Marines' activities for which they were there and restricted access to the Marine Corps booth. He later learned of people who had intended to see them in their booth but didn't because of the congestion defendants had caused in front of that booth. One of the bank employees complained to authorities about this. After that a representative of the university who had charge of the carnival read an order to defendants advising them that they were trespassing and requiring them to cease the activities in which they were engaged and stop obstructing the normal use of the university facilities. Defendants refused to comply and were thereupon arrested by university police officers.

Defendants were charged with having violated CLS 1961, § 750.552 (Stat Ann 1954 Rev § 28.820[1]), which reads:

"Any person who shall wilfully enter, upon the lands or premises of another without lawful author-

ity, after having been forbidden so to do by the owner or occupant, agent or servant of the owner or occupant, or any person being upon the land or premises of another, upon being notified to depart therefrom by the owner or occupant, the agent or servant of either, who without lawful authority neglects or refuses to depart therefrom, shall be guilty of a misdemeanor and upon conviction thereof shall be punished by imprisonment in the county jail for not more than 30 days or by a fine of not more than $50, or both, in the discretion of the court."

and, also, Michigan State University Ordinance § 16.01, adopted by the university trustees under authority of CL 1948, § 19.141 *et seq.* (Stat Ann 1969 Rev § 4.201 *et seq.*), the ordinance in question reading:

"No person or persons shall, without authorization, assemble together anywhere on the campus for the purpose of creating any noise or disturbance, riot, 'panty raid' or other improper diversion, or assemble in a manner which obstructs the free movement of persons about the campus or the free and normal use of university buildings and facilities, or prevents or obstructs the normal operations of the university."

The fact that defendants were carrying posters, signs and the coin box and distributing leaflets, all designed to give expression to their views about the Viet Nam war and the United States' part in it, affords the basis now for their claim that their rights of speech, assembly and petition, guaranteed by the First and Fourteenth Amendments to the United States Constitution, were abridged and denied. This is a red-herring attempt to becloud the real issue. Had defendants possessed and exhibited none of the above items and engaged only in blocking and obstructing access to the two booths

and interfering with the exhibitors' operations therein and the purposes for having the booth and exhibit, as they did, that would have sufficed to constitute violations of the cited statute and ordinance and warranted affirmance of the circuit court convictions. The fact that, in addition to such acts, defendants did, however, further pursue their objective of embarrassing the military forces of the United States by carrying and displaying signs and handing out literature in no wise diminishes their guilt as above stated nor excuses it.

If, however, as defendants contend, the question, not passed on by the Court of Appeals, of whether defendants' First and Fourteenth Amendment rights were violated ought now to be considered by this Court, an examination of what the United States Supreme Court has said and held in this connection will prove helpful to a decision by us here though not so for defendants' position. In *Adderley* v. *Florida* (1966), 385 US 39 (87 S Ct 242, 17 L Ed 2d 149), Mr. Justice Black, speaking for a majority of the Court, said:

"The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated. For this reason there is no merit to the petitioners' argument that they had a constitutional right to stay on the property, over the jail custodian's objections, because this 'area chosen for the peaceful, civil rights demonstration was not only "reasonable" but also particularly appropriate  *  *  *  .' Such an argument has as its major unarticulated premise the assumption that people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please. That concept of constitutional law was vigorously and forthrightly rejected in two of the cases petitioners rely on  *  *  *  . We reject it again.

The United States Constitution does not forbid a state to control the use of its own property for its own lawful and nondiscriminatory purpose."

In *Cox* v. *Louisiana* (1965), 379 US 536 (85 S Ct 453, 13 L Ed 2d 471), the United States Supreme Court said, through Mr. Justice Goldberg:

"The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time."

In that same case Mr. Justice Black wrote:

"The First and Fourteenth Amendments, I think, take away from government, state and federal, all power to restrict freedom of speech, press, and assembly *where people have a right to be for such purposes.* This does not mean, however, that these amendments also grant a constitutional right to engage in the conduct of picketing or patrolling, whether on publicly owned streets or on privately owned property. * * * Were the laws otherwise, people on the streets, in their homes and anywhere else could be compelled to listen against their will to speakers they did not want to hear."

For all that defendants may proclaim about their rights of freedom of expression, they had no right to resist the university's exercise of control over its property, to restrict its use for the purpose decided upon by the university, or to speak whenever, however, wherever and to whomever they pleased in violation of directions not to do so by the owner of or the public authority in control of the property where the attempt to speak is made. This claim of defendants is without merit.

The record shows that a university official having authority to do so ordered defendants to desist, that

they refused and, hence, were trespassers under and in violation of the quoted statutory provisions, and, further, that in obstructing, in part at least, the program of the Career Carnival sponsored and set up by the university, they were likewise guilty of violating the quoted ordinance.

Defendants complain of the circuit court's imposition, on appeal, of a harsher sentence than the previous one pronounced by the justice of the peace. This was not error. See *People* v. *Olary* (1969), 382 Mich 559.

Court of Appeals order reversed and judgment of conviction and sentence of the circuit court affirmed.

T. E. BRENNAN, C. J., and KELLY and BLACK, JJ. concurred with DETHMERS, J.

ADAMS, J. This is not an ordinary trespass case. Defendants claim a right to be where they were, a right to confront in a particular setting those with whom they disagreed.

Justice DETHMERS states in his opinion: "The record shows that a university official having authority to do so ordered defendants to desist. * * * ."

Since I consider this to be the key issue in this case, while I agree with the result reached by Justice DETHMERS, I have decided to examine in somewhat more detail than he does the question as to whether defendants were ordered to desist by a university official having authority to give such an order.

PA 1931, No 328, § 552 added by PA 1951, No 102 (CLS 1961, § 750.552; Stat Ann 1954 Rev § 28.820 [1]), provides:

"Any person who  *  *  *  upon being notified to depart therefrom by the owner or occupant, the agent or servant of either, who without lawful authority neglects or refuses to depart therefrom, shall

be guilty of a misdemeanor and upon conviction
thereof shall be punished by imprisonment in the
county jail for not more than 30 days or by a fine
of not more than $50, or both, in the discretion of
the court."

PA 1905, No 80 (CL 1948, § 19.141, *et seq.*; Stat
Ann 1969 Rev § 4.201, *et seq.*), in § 1 provides that
the boards in control of various state buildings and
properties—

"* * * shall have authority to make and pre-
scribe rules and regulations for the care, preserva-
tion and protection of buildings and property dedi-
cated and appropriated to the public use, over which
they have jurisdiction or power of control and the
conduct of those coming upon the property thereof,
which may be necessary for the maintenance of good
order and the protection of said state property; and
shall have authority to enforce such rules and
regulations, * * * ."

Ordinance 13.01 of Michigan State University
provides:

"The Secretary of the Trustees of Michigan State
University is hereby empowered to establish regula-
tions *restricting* or *prohibiting* access to and/or use
of university buildings and property by employees
and students of the university and by members of
the general public when such regulations are deemed
desirable for the convenient and efficient conduct of
the affairs of the university or for the management
and protection of its property; *provided such regula-
tions must be posted at the entrances to the facility
or portion of the facility or building affected.*"
(Emphasis added.)

Mr. Jack W. Breslin, Secretary of the Board of
Trustees, called as a witness for the People, gave
no testimony that he had established or posted any
regulation restricting or prohibiting the use of the

portion of the union in which the Career Carnival
was held, nor was there any testimony by any other
person of any posting of such notices.

Ordinance 16.01 provides:

"No person or persons shall, without authoriza-
tion, assemble together anywhere on the campus for
the purpose of creating any noise or disturbance,
riot, 'panty raid' or other improper diversion or
assemble in a manner which obstructs the free move-
ment of persons about the campus or the free and
normal use of university buildings and facilities or
prevents or obstructs the normal operations of the
university."

As background to the occurrences on October 12,
1965, it should be noted that in the summer of 1965
defendant Harrison was arrested under the univer-
sity's commercial handbill ordinance by the univer-
sity police for distributing a pamphlet. The charges
were dropped after Vice President for Student
Affairs, Dr. John D. Fuzak, intervened. He testi-
fied:

"The distribution was made, or the comment or
the accusation was made, that distribution was being
made inside of the building, and this proved to be
erroneous. When I learned of it and looked into
it I found that it was erroneous, that the distribu-
tion was not being made inside of the building, but
rather outside.

"The arrest was made on the basis of the ordi-
nance, which I believe to be erroneous, that is, to
have an erroneous application of the ordinance
which was designed to control commercial advertis-
ing, and this sort of thing.  *  *  *

"Q. Was the prosecution dropped?

"A. Yes,  *  *  * ."

Justice DETHMERS has stated what took place at
the Career Carnival during the day before the de-

fendants were given notice to depart. Consequently, those events need not be again narrated here.

The testimony of Mr. John D. Shingleton, Director of the Placement Bureau, with regard to his order to defendants to desist, is as follows:

"*Q.* Now, I show you what has been marked as People's Exhibit No. 9 and ask you if you can identify the exhibit.

"*A.* This is a statement that I read on October 12 to the defendants.

"*Q.* How many times, approximately, did you read that statement?

"*A.* Three times.

\*     \*     \*

"*Mr. Reisig:* May it please the court, I would like to have Mr. Shingleton read this into the record.

"*The Court:* All right.

"*The Witness:* 'Pursuant to authority vested by the Constitution and by the Legislature of the State of Michigan and by the Board of Trustees of Michigan State University and by administration of the university, I am now advising you that you are occupying space assigned to others, and thereby you are trespassing upon university property, and you are further in violation of university ordinances by displaying and distributing handbills upon property governed by the Board of Trustees without authority and by obstructing free and normal use of the university facilities. You have ten minutes in which to move your materials and signs outside of this building. You are as welcome as any other student or guest to review the displays of this Career Carnival as long as your activities are lawful and orderly.'

\*     \*     \*

"*Q.* Did the defendants, or any one of them, ask you questions after you read the statement?

"*A.* I don't recall any questions."

On cross-examination, the witness testified:

"*Q.* Now, when you first read your statement did any of these defendants ask you under what law you were acting or under what ordinance?

"*A.* Yes, I think that question was asked.

"*Q.* And did you tell them what law you were acting under?

"*A.* My reply to that was, 'I have read this statement and the statement speaks for itself.'

"*Q.* Now, isn't it a fact, Mr. Shingleton, that after you made that statement, that the statement speaks for itself, that the defendants, or one of them, replied, that if you could cite a valid ordinance that they would accede to your request, do you recall that?

"*A.* I remember how I reacted when I read the statement. I read the statement, the question was asked, I made the statement in rebuttal that the statement speaks for itself. I turned and left."

Defendant Howard Harrison's testimony with regard to what occurred is as follows:

"*Q.* And in that statement was there any citation of any ordinance?

"*A.* No. At that time I asked him once again what ordinance are we being charged with. His only response was, 'You have heard the statement read, that is it.' He turned around and went down to the next person. Now, I understand that some of the other people were given an ordinance, but I myself wasn't. The thing that I had been wanting from the administration all day was that if they were going to ask us to leave, for once to do it under a rule of law, not through arbitrary authority."

Mr. Harrison also testified on cross-examination as follows:

"*Q.* Were you not advised, Mr. Harrison, that there were also state laws, such as trespass laws that you were violating?

"*A.* It seemed to me inconceivable that students and guests could be trespassing in the Student Union Building. But I was not told this at that time."

The testimony of defendant Fred Warren Janvrin with regard to what occurred after Mr. Shingleton read the statement is as follows:

"Well, I went over to the other people who had been distributing literature, and we discussed what the thing had said, what the statement had said, and whether or not we believed that we should abide by the statement. I personally felt that it was, to say the least, unusual for students to be ordered out of the Student Union Building, and I felt that Mr. Shingleton had no right to order me out of the Student Union Building.

"*Q.* You were questioning his authority then, is that correct?

"*A.* No, I questioned an order ordering us students out of the Student Union Building when it is open."

The testimony of Albert Phillip Halprin was:

"*Q.* And when Mr. Shingleton read this did you say anything to him?

"*A.* Yes. First I asked him by what authority he was reading this, and he refused to answer. Next I asked for a specific ordinance, and he refused to answer. Then I asked him since there were parts of the union that were not being used as part of the Career Carnival whether or not I could move to another part of the union.

"*Q.* When you say union, you mean the Student Union Building?

"*A.* Yes. Anywhere I could go in this building and distribute my literature unimpeded. He replied

that the statement stood for itself. I glanced down at the statement again and it said that I must take my literature out of the building."

The Student Union Building was unquestionably the students' building. Mr. Breslin, Secretary of the University, testified:

"*Q.* And what is the purpose of that building?

"*A.* The Student Union Building is a student activity building. It has rooms for the use of students that belong to different organizations. It has recreation facilities, it has a bowling alley, it has a billiard room, it has [a] barber shop, it has a lounge where students can just sit down between classes, it has a browsing room where students can sit and read, it also has a faculty dining facility, it has a large cafeteria, and it has public meeting rooms.

"*Q.* And does the student at Michigan State University need any special pass or anything like that to get into the Student Union Building?

"*A.* No, sir.

"*Q.* Free to go into that building at any time?

"*A.* Yes, sir.

\*    \*    \*

"*Q.* Now, is it the policy of the university to permit students to carry any literature of their own to that Student Union Building?

"*A.* Yes, they could carry literature of their own in the Student Union Building."

Vice President Fuzak testified with regard to the general policy of the university as to distribution of literature and with regard to specific uses of the Student Union Building:

"*Q.* What was that policy?

"*A.* \*    \*    \* The general policy was to permit distribution of literature of any sort on the campus

outside of the buildings; to permit distribution in certain non-academic buildings, and in public areas of those buildings.  Such as the Student Union Building, Student Services Building, lobby, etc., and anywhere outside of the buildings, but not in the classroom buildings; *not in the areas of the buildings that were reserved or were held for particular purposes or uses at that time.*  (Emphasis added.)

\* \* \*

"*Q.* But generally it is for the use of the students in their social, their own social, political, and economic or intellectual activities?

"*A.* Yes, at least partially.  However, it is reserved for particular groups; it is reserved for particular uses.  Under those circumstances the areas that have been reserved are not public areas of the building.  In other words, the use of certain rooms or areas of the building are often assigned. For example, they might be assigned to a student group.  They may be assigned to a faculty group. They may occasionally be assigned to an outside group.  *When those reservations are made, and the assignments made, then you have specific uses for that building, not all the building, but part of it.*" (Emphasis added.)

Mr. Michael J. Dmochowski, the University's Manager of the Student Union Building, testified that certain portions of the building were assigned to the Placement Bureau for the holding of the annual Career Carnival.  The identity of Mr. Shingleton and his function as Director of the Placement Bureau were known to defendants.  If the area used by the Placement Bureau had been assigned to it for its use, then, even though the Student Union was a student building, that area was under his control and for the use of the Bureau just as any part of the building assigned to a particular group would have been.  This was clearly within university policy for the use of the building.  I do not regard the univer-

sity ordinance authorizing the secretary to establish regulations restricting or prohibiting access and use of university buildings as mandating the posting of regulations pertaining to the use of university buildings. The ordinance is clearly permissive. Its purpose would seem to be to authorize the secretary to take restrictive or prohibitive measures with regard to a university building or facility if it was deemed desirable so to do.. In no way does it purport to restrict university officials from operating a great University in normal fashion.

The trial judge found:

"This function at the college or university on the second floor of the Student Union Building was a regulated function. It was a function in which those who were there to disseminate their information first obtained leave to do so and were assigned an area in which to do it, but the defendants here chose to go there without permission to distribute their information and to do it wherever they chose to do it. This, in my opinion, was improper, and, when they were asked to leave, they should have left, and, by not doing so, they violated this statute.

"Turning now to the ordinance again, where it speaks of the free and normal use of the university buildings, I am inclined to think that this cannot be construed or interpreted to mean as the defendants have urged in this narrow sense. I think its meaning is of a much more, broader nature, and, as we look back on this, and, as the proofs show from what happened, there was an obstruction of free and normal use of that floor and of that Career Carnival.

"The court is of the opinion that the People have proven that the defendants are guilty beyond a reasonable doubt of each count of the warrant."

The First Amendment to the United States Constitution accords the right of freedom of speech. The Ninth Amendment reserves the right under

certain circumstances to decline to listen. The issue was recently presented to the Supreme Court of the United States in the case of *Rowan* v. *United States Post Office Department* (1970), 397 US 728 (90 S Ct 1484, 25 L Ed 2d 736), as follows:

"The essence of appellants' argument is that the statute violates their constitutional right to communicate. One sentence in appellants' brief perhaps characterizes their entire position:

" 'The freedom to communicate orally and by the written word and, indeed, in every manner whatsoever is imperative to a free and sane society.' Brief for Appellants at 15.

"Without doubt the public postal system is an indispensable adjunct of every civilized society and communication is imperative to a healthy social order. But the right of every person 'to be let alone' must be placed in the scales with the right of others to communicate."

Chief Justice Burger, in whose opinion five Justices joined and with whose opinion two Justices concurred, went on to say:

"Nothing in the Constitution compels us to listen to or view any unwanted communication, whatever its merit; * * * .

"* * * no one has a right to press even 'good' ideas on an unwilling recipient."

In this case, the evidence is clear that defendants did not attend the Career Carnival as students or guests who were interested in discussing possible careers with those who had been assigned space at the Carnival but for an entirely different purpose—to express their views in opposition to the views of others. In so doing, they sought not a voluntary confrontation but a coerced confrontation. This is not within the guarantee of the First Amendment.

Having previously prevailed in a test of the right to distribute material outside of University buildings, they now insisted not only upon the right to do so within the Student Union Building but to do so by taking over space that had been assigned to others. The claim that they must be shown an ordinance before they would leave and by one in authority is specious in view of the fact that the Career Carnival was an annual function that had operated for 17 years and that Mr. Shingleton was head of the Placement Bureau. The statute requires only notice to depart. The university ordinance prohibits obstruction of the free and normal use of university buildings. Defendants asserted they had the right to take over space assigned to the Career Carnival. They did so. They were notified to depart. They refused to depart.

I vote to affirm the judgment of conviction and sentence of the circuit court.

T. E. Brennan, C. J., and T. M. Kavanagh, J. concurred with Adams, J.

T. M. Kavanagh, J. I concur in the opinion of Justice Adams and agree with his disposition of the case.

Defendants did not attend the Career Carnival as students or guests who were interested in discussing possible careers with those who had been assigned space at the Carnival but for entirely different purposes. The defendants sought not only to advance their views but to frustrate the free expression and dissemination of the views of the recruiters at the Carnival. In so doing, they attempted to use their claimed First Amendment rights in a manner that interfered with the rights

of others. Such actions are not within the ambit of the First Amendment guarantee.

T. E. BRENNAN, C. J., concurred with T. M. KAVANAGH, J.

T. G. KAVANAGH, J., did not sit in this case.