## CIRCUIT COURT OF HIGHLAND COUNTY

Leonidas M. Schwartz

    v.

Highland County School Board

July 18, 1985

By JUDGE DUNCAN M. BYRD, JR.

This matter comes to the Court upon a Petition for Judicial Review pursuant to Code of Virginia, 1950, as amended, Section 22.1-87, from the decision of the Highland County School Board denying a request by the petitioners for "religious exemption" from compulsory public school attendance for their four children. The applicable Code Section 22.1-257(A)(2) states "[a] school board shall excuse from attendance at school any pupil who, together with his parents, by reason of bona fide religious training or belief, is conscientiously opposed to attendance at school." Code Section 22.1-257(C) states "[a]s used in paragraph (A)(2) of this section, the term 'bona fide religious training or belief' does not include essentially political, sociological or philosophical views or a merely personal moral code."

The leading applicable case law is set forth in *State of Wisconsin v. Jonas Yoder et al.*, 406 U.S. 205, 32 L.Ed.2d 15, 92 S.Ct. 1526 (1972). There the Court stated:

> There is no doubt as to the power of a State, having a high responsibility for education of its citizens, to impose reasonable regulations for the control and duration of basic education. See, *e.g., Pierce v. Society of Sisters*, 258 U.S. 510, 534, 45

S.Ct. 571, 573, 69 L.Ed. 1070 (1925). Providing public schools ranks at the very apex of the function of a State. Yet even this paramount responsibility was, in *Pierce,* made to yield to the right of parents to provide an equivalent education in a privately operated system. There the Court held that Oregon's statute compelling attendance in a public school from age eight to age 16 unreasonably interfered with the interest of parents in directing the rearing of their offspring, including their education in church-operated schools. As that case suggests, the value of parental direction of the religious upbringing and education of their children in their early and formative years have a high place in our society. See also *Ginsberg v. New York,* 390 U.S. 629, 639, 88 S.Ct. 1274, 1280, 20 L.Ed.2d 195 (1968); *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); cf. *Rowan v. United States Post Office Dept.,* 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970). Thus, a State's interest in universal education, however highly we rank it, is not totally free from a balancing process when it impinges on fundamental rights and interests, such as those specifically protected by the Free Exercise Clause of the First Amendment, and the traditional interest of parents with respect to the religious upbringing of their children so long as they, in the words of *Pierce,* "prepare [them] for additional obligations." 268 U.S., at 535, 45 S.Ct., at 573. *Yoder,* at 1532.

The Court further stated that "[w]e can accept it as settled, therefore, that, however strong the State's interest in universal compulsory education, it is by no means absolute to the exclusion of subordination of all other interests." *Id.,* at 1533.

However, in evaluating the quality of the claims of the petitioner, the Court must be careful to determine whether the religious faith of the petitioners

and their mode of life are inseparable and interdependent. *Id*. Because, as the court stated:

> A way of life, however virtuous and admirable, may not be interposed as a barrier to reasonable state regulation of education if it is based on purely secular considerations; to have the protection of the Religion Clauses, the claims must be rooted in religious belief. Although *a determination of what is a "religious" belief or practice entitled to constitutional protection may present a most delicate question, the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests. Id.* (Emphasis added.)

In commenting upon the duty to prepare the child for "additional obligations" referred to by the Court in *Pierce*, the Court stated this duty:

> . . . must be read to include the inculcation of moral standards, religious beliefs, and elements of good citizenship. *Pierce*, of course, recognized that whether nothing more than the general interest of the parent in the nurture and education of his children is involved, it is beyond dispute that the State acts "reasonably" and constitutionally in requiring education to age 16 in some public or private school meeting the standards prescribed by the State. *Id*., at 1542.

Finally the Court cautioned that the disposition in *Yoder*:

> . . . in no way alters our recognition of the obvious fact that courts are not school boards or legislatures, and are ill-equipped to determine the "necessity" of discrete aspects of a State's program of compulsory education. *This should suggest that courts must move with great circumspection in*

> *performing the sensitive and delicate task of weighing a State's legitimate social concern when faced with religious claims for exemption from generally applicable educational requirements.* It cannot be overemphasized that we are not dealing with a way of life and mode of education by a group claiming to have recently discovered some "progressive" or more enlightened process for rearing children for modern life. *Id.,* at 1543. (Emphasis added.)

Unlike the facts in *Yoder* where the Court found that:

> Aided by a history of three centuries as an identifiable religious sect and a long history as a successful and self-sufficient segment of American society, the Amish in this case have convincingly demonstrated the sincerity of their religious beliefs, the interrelationship of belief with their mode of life, the vital role the belief and daily conduct play in the continued survival of Old Order Amish communities and their religious organization, and the hazards presented by the State's enforcement of a statute generally valid as to others. *Id.;*

there was no evidence presented by the petitioners that public education was at odds with any of the tenets of their Jewish Orthodox faith. In fact, the evidence before the school board, concededly hearsay, was quite to the contrary. There is no evidence to support the claims of the petitioners other than the conclusory subjective statement that their request is sincere and based upon "their" religious beliefs.

Moving with great circumspection in performing the sensitive and delicate task of weighing the state's legitimate social concern against the petitioner's religious claim for exemption from compulsory public school the Court must conclude that the petitioner's "religious claims" are more philosophical and personal than religious and as such do not rise to the demands of the religious clauses. *Id.,* at 1533.

Finding the school board has not exceeded its authority, acted arbitrarily or capriciously, or abused its discretion, the action of the school board is sustained.