Roberts, J., filed a dissenting opinion on rehearing in which Phillips, J., joined.

Clinton, J., filed a dissenting opinion on rehearing in which Onion, P. J., joined.

**Shirley KRAMER, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 57355.

Court of Criminal Appeals of Texas, Panel No. 2.

April 18, 1979.

On Rehearing Oct. 1, 1980.

Paul J. Chitwood, Dallas, for appellant.

Henry M. Wade, Dist. Atty., John H. Hagler, Andy Anderson and R. R. Smith, Jr., Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty., Austin, for the State.

Before ODOM, PHILLIPS and W. C. DAVIS, JJ.

## OPINION

PHILLIPS, Judge.

This is an appeal from a conviction for harassment. V.T.C.A., Penal Code, Section 42.07(a)(1). Punishment was assessed at six months' imprisonment, but imposition of sentence was suspended while appellant was placed on probation.

V.T.C.A., Penal Code, Section 42.07 in relevant part to this cause provides as follows:

(a) A person commits an offense if he intentionally:

(1) communicates by telephone or in writing in vulgar, profane, obscene, or indecent language or in a coarse and offensive manner and by this action intentionally, knowingly, or recklessly annoys or alarms the recipient or intends to annoy or alarm the recipient;

\* \* \* \* \* \*

(c) An offense under this section is a Class B misdemeanor.

Under this provision of the harassment statute the elements the State must prove are (1) a person (2) intentionally (3) communicates (by telephone or *writing*) (4)(a) in vulgar, profane, obscene, or indecent language or (b) in a coarse and offensive *manner* and by such action (5)(a) intentionally, knowingly, or recklessly annoys or alarms the recipient or (b) *intends* to annoy or alarm the *recipient.*

The information charging the appellant in this cause recites in relevant part:

... SHIRLEY KRAMER ..., on or about the 31st day of December A.D., 1975 ..., did unlawfully knowingly and intentionally communicate in writing in a coarse and offensive manner with another, namely; ANNE KEISER, and by this action did intend to annoy and alarm and did annoy and alarm the said ANNE

KEISER, the recipient, said written communication being of the tenor following:

Baby Problem Solved!

–With this beautiful

ALL METAL

CASKET–VAULT COMBINATION

CRYPT–a–CRIB

P. O. Box 11074

Cincinnati, Ohio 45211

By so charging the appellant, the State was obligated to prove elements 1, 2, 3, 4b, and 5b as set forth above.

Appellant's fifth ground of error challenges the sufficiency of the evidence to sustain the judgment of conviction in this cause. The State, in its case in chief, called the complaining witness, Anne Keiser, who testified that she was the wife of one John Keiser who had by him a son on December 22, 1975. She returned to her home at 526 Shelley Court in Duncanville on Christmas Day, 1975. On December 31, 1975, she found State's Exhibit No. 1 in the mailbox which was a postcard–type communication containing the above–quoted message that formed the basis for this prosecution. She also identified State's Exhibit No. 2, a typewritten envelope addressed to her husband which contained State's Exhibit No. 3, a handwritten letter from a person signing "Shirley." She also identified State's Exhibit No. 4, another typewritten envelope addressed to her husband which contained State's Exhibit No. 5, a typewritten letter also signed by "Shirley." She testified that State's Exhibit No. 1 annoyed and alarmed her. On cross–examination, she testified that there was nothing coarse or offensive in the manner in which the postman delivered State's Exhibit No. 1 to her mailbox.

She also acknowledged that the appellant was a former girlfriend of her husband's. The State next introduced the testimony of Harry Felker, a criminalist with the Dallas County Criminal Investigation Laboratory, who specialized in the examination of questioned documents. He testified that he was of the opinion that State's Exhibits 1, 2, 4, and 5 were all typed on the same typewriter. He further testified that the handwriting in State's Exhibit No. 3 matched the handwriting and came from the same individual who provided the exemplars found in State's Exhibit No. 6. Subsequent testimony established that the appellant provided the exemplars in State's Exhibit No. 6. On cross–examination, Felker acknowledged that no blow·-ups were produced of the typed print, that he was never given a typewriter, could not determine the model of the typewriter used in producing the exhibits referred to or whether the typewriter was manual or electric. He testified that no ink comparison was made but that he did compare the spacing between letters and each letter. He testified he did not know who the author of these various exhibits was. On redirect examination, the witness testified that this particular typewriter involved had an individual characteristic in that the capital letters would type at a position a little lower than the small case letters on the same line.[1] After establishing the source of the handwriting exemplars in State's Exhibit No. 6, the State rested and the appellant made his first motion for instructed verdict alleging that the State failed to prove the essential elements of the information charging the appellant. This motion was denied. After the State introduced rebuttal testimony from John Keiser, the husband, which did not shed any further evidence on the elements of this offense, the appellant renewed her motion for instructed verdict and it was again denied. Appellant challenges the sufficiency of the evidence to sustain this conviction

---

1. We note that the typefacing in the statement of facts before us possesses this same characteristic of linear deviation. We further note that no testimony was produced as to the precise measurements of the linear deviation described by the witness.

under her fifth ground of error. We agree with her contention and reverse.

This case was based on circumstantial evidence. The only evidence connecting the appellant to the postcard containing the annoying and alarming message was the testimony of the questioned documents examiner who stated that the same typewriter was used to address that correspondence as well as other envelopes and another letter addressed to the husband of the complaining witness. These letters were simply signed "Shirley." The typewriter was never produced nor was it established where it was located or whether the appellant was the only one with access to such a typewriter. This deficiency alone is enough to sustain reversal of this case. See *Steinhauser v. State*, Tex.Cr.App., 577 S.W.2d 257.

There is no evidence to sustain the jury's conclusion that the appellant intended to annoy or alarm the recipient of the written communication. V.T.C.A., Penal Code, Section 6.03(a) defines intent as a conscious objective or desire to cause the result reached. Such a conclusion is negated by the fact that the communication was addressed to John M. Keiser and not his wife, the complaining witness. The State had available to it the alternative element of intentionally, knowingly, or recklessly annoying or alarming the recipient. They chose to pursue the more restrictive element and the evidence fails to establish it. It is undisputed that the complaining witness was indeed a recipient, even though not the intended recipient.

Further, as part of the actus reas of this offense the State chose to allege the manner of the communication's delivery and that it was "coarse and offensive." The testimony in this cause shows that the communication was delivered through the United States Postal Service and that nothing in the manner of its delivery was "coarse or offensive." Since the contents of a message that offends this statute is dealt with in an alternative and specific provision, we must construe the element of "a coarse and

offensive manner" as relating to the mode of delivering an offending message.

For the foregoing reasons, the judgment of conviction is reversed. In light of the United States Supreme Court decisions in *Burks v. U. S.*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), and *Greene v. Massey*, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978), this judgment is reformed to reflect an acquittal. This cause is remanded for proceedings consistent with Article 37.12, V.A. C.C.P.

ODOM, J., dissents.

Before the court en banc.

## OPINION ON STATE'S MOTION FOR REHEARING

DOUGLAS, Judge.

This is an appeal from a conviction for harassment, as denounced by V.T.C.A., Penal Code, Section 42.07(a)(1). The jury assessed punishment at 180 days, probated.

Upon original submission, a panel of this Court found, with one judge dissenting, that the evidence is insufficient to support the judgment. We now hold that the evidence is sufficient to support the conviction.

The uncontroverted testimony of complainant Anne Keiser establishes that on December 31, 1975, six days after returning home from the hospital with her newborn son, complainant found State's Exhibit # 1 in the mailbox of the home where she and her husband resided. The exhibit is a postcard, addressed to her husband, John Keiser, with the following message, apparently taken from a newspaper advertisement, affixed to the back:

"Baby Problem Solved!

with this beautiful

ALL METAL

CASKET–VAULT COMBINATION

CRYPT–A–CRIB

P. O. Box 11074

Cincinnati, Ohio 45211"

The sending of that postcard is the action complained of in the State's information.

Viewed in a light most favorable to the verdict of the jury, the testimony of the Keisers and of Harry L. Felker, Jr., an expert document examiner, establishes the following:

Appellant first met John Keiser in 1970, when both lived in the same apartment building in Honolulu, Hawaii. Keiser and appellant lived together for a period of almost four months, after which appellant left Hawaii. When appellant returned to Hawaii, Keiser had already met Anne Keiser and no further contact with appellant was initiated by Keiser.

The Keisers were married in May, 1971. Between that time and August, 1974, when the Keisers moved to Duncanville, appellant repeatedly was observed by the Keisers near their living quarters. Appellant also wrote frequently to John Keiser.

The correspondence continued after the Keisers moved to Duncanville, to the extent that, although much of it was disposed of by the Keisers, two or three grocery sacks of mail were made available to the Dallas County district attorney's office. Included among that correspondence were two letters, one typewritten and one in longhand, both signed "Shirley", and their typewritten envelopes, addressed to John Keiser and marked "restricted delivery." Those letters and envelopes were admitted in evidence.

The content of both letters demonstrates an intent by their author to continue seeing and otherwise contacting John Keiser despite attempts upon his part, described in the letters, to avoid their author.

Comparison of the handwriting of the longhand letter and of a writing exemplar of the appellant showed the letter to have been written by appellant.

Comparison of the typewritten letter, the envelopes, and the address of the postcard on a letter by letter basis using sophisticated optical comparison equipment revealed that each exhibit was typed upon the same machine.

The record shows further that appellant, after threatening for some time to follow the Keisers to Duncanville, appeared one day outside of John Keiser's place of work and subsequently and repeatedly both near his place of work and outside the Keiser home, and that appellant was aware of Keiser's work schedule and of Mrs. Keiser's pregnancy.

Appellant's long standing course of conduct, combined with her knowledge of Anne Keiser's pregnancy and the use of the same typewriter to address each of the State's exhibits, is sufficient to exclude other reasonable inferences than that appellant sent the postcard that is the basis of this prosecution.

Appellant's knowledge of John Keiser's work schedule and her knowledge that she could send letters to John Keiser without Anne Keiser seeing their contents prior to her husband's perusal of them, demonstrated by appellant's prior use of "restricted delivery" postal service in writing to John Keiser, make untenable appellant's argument that the postal card may not have been meant to be seen by Anne Keiser, but may have been for John Keiser's eyes only.

The question of whether the message on the postcard was intended to annoy and alarm the mother of a newborn baby, six days home from the hospital, is answered by the message itself.

In *Sullivan v. State*, 564 S.W.2d 698 (Tex. Cr.App.1978), this Court, on motion for rehearing, said:

"It is well established that a conviction on circumstantial evidence cannot be sustained if the circumstances do not exclude every other reasonable hypothesis except that of guilt and proof amounting only to a strong suspicion is insufficient. *Flores v. State*, 551 S.W.2d 364 (Tex.Cr. App.1977); *Moore v. State*, 532 S.W.2d 333 (Tex.Cr.App.1976); *Indo v. State*, 502 S.W.2d 166 (Tex.Cr.App.1973). However, it is not necessary that every fact point directly and independently to the defendant's guilt; it is enough if the conclusion is warranted by the combined and

cumulative force of all the incriminating circumstances. *Flores v. State*, supra; *Herndon v. State*, 543 S.W.2d 109 (Tex. Cr.App.1976). . . . "

In the instant case, as in Sullivan, the evidence, taken as a whole, excludes to a moral certainty every reasonable hypothesis except appellant's guilt.

Appellant contends that the information fails to state a cause of action because the language of the message complained of is not in itself coarse or offensive, nor was it communicated in a coarse or offensive manner. V.T.C.A., Penal Code, Section 42.07(a), provides:

> "(a) a person commits an offense if he intentionally:
>
> "(1) communicates by telephone or in writing in vulgar, profane, obscene, or indecent language or in a coarse and offensive manner and by this action intentionally, knowingly, or recklessly annoys or alarms the recipient or intends to annoy or alarm the recipient; . . . "

Appellant contends that to fit the proscription of Section 42.07, supra, the language of the message or its manner of delivery must be coarse and offensive because the substantive proscription of the sections were limited to vulgar, profane, obscene or indecent language, while "coarse and offensive manner" refers only to the means of delivery. We decline to follow such a construction.

▮ We hold that the statute as applied to this case requires only that one communicate with another by telephone or in writing "in a coarse and offensive manner" with intent to alarm on the part of the sender. A seemingly harmless group of words can be intended to cause their recipient great distress, and that intent can be carried out to great effect. The instant case is precisely the situation where the alternative of a "coarse and offensive manner" is necessary to vindicate the rights of the recipient of spite messages and the

State's interest in protecting citizens from such intrusion.

Appellant contends that Section 42.07(a) is vague and overbroad, and therefore violative of appellant's Fourteenth Amendment rights. Appellant bases her vagueness contention on the use in the statute of the words "annoy", "alarm", "coarse" and "offensive:" This Court rejected the same contention as to the words "annoy" and "alarm" in Section 42.07 in *Collection Consultants, Inc. v. State*, 556 S.W.2d 787 (Tex. Cr.App.1977).

▮ Appellant argues that if we allow the statute to stand then any recipient of a message may decide what that recipient thinks is "coarse and offensive", and that the person of ordinary intelligence is therefore without a guide to the conduct forbidden by Section 42.07. But the gravamen of the violation of Section 42.07(a) as charged in the information is the *intent* to annoy and alarm by means of a "coarse and offensive" message. The alternative, not charged in the instant case, would require that the actor be at least reckless in actually annoying or alarming the recipient of his coarse and offensive message. There is no room in the statute for a vindictive or overly sensitive recipient to create an offense by his own belief in the coarseness or offensiveness of a message. When the provisions of the statute, including the culpability requirement, are read together, a person of ordinary intelligence can readily understand what is proscribed.

▮ Neither is Section 42.07(a) unconstitutionally overbroad. In reversing the conviction of a person who wore a jacket bearing the words "\_ \_ \_ \_ the draft" inside a courthouse, the Supreme Court said:

> " . . . No individual actually or likely to be present could reasonably have regarded the words on appellant's jacket as a direct personal insult. . . .
>
> " \* \* \*
>
> "Finally, in arguments before this Court much has been made of the claim

that Cohen's distasteful mode of expression was thrust upon unwilling or unsuspecting viewers, and that the State might therefore legitimately act as it did in order to protect the sensitive from otherwise unavoidable exposure to appellant's crude form of protest. Of course, the mere presumed presence of unwitting listeners or viewers does not serve automatically to justify curtailing all speech capable of giving offense. See, e. g., *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971). While this Court has recognized that government may properly act in many situations to prohibit intrusion into the privacy of the home of unwelcome views and ideas which cannot be totally banned from the public dialogue, e. g., *Rowan v. United States Post Office Dept.*, 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970), we have at the same time consistently stressed that 'we are often "captives" outside the sanctuary of the home and subject to objectionable speech.' Id., at 738, 90 S.Ct., at 1491. The ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is, in other words, dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner. Any broader view of this authority would effectively empower a majority to silence dissidents simply as a matter of personal predilections.

"In this regard, persons confronted with Cohen's jacket were in a quite different posture than, say, those subjected to the raucous emissions of sound trucks blaring outside their residences. Those in the Los Angeles courthouse could effectively avoid further bombardment of their sensibilities simply by averting their eyes. And, while it may be that one has a more substantial claim to a recognizable privacy interest when walking through a courthouse corridor than, for example, strolling through Central Park, surely it is nothing like the interest in being free from unwanted expression in the confines of one's own home...." *Cohen v. California*, 403 U.S. 15, 22, 91 S.Ct. 1780, 1786, 29 L.Ed.2d 284 (1971).

Section 42.07(a) does not by its terms regulate public communication· it deals with messages communicated to a *recipient* over the telephone or in writing.

Use of the word "recipient" rather than "viewer" indicates that the writing contemplated is in the nature of a letter or personal message. Acts forbidden by Section 42.-07(a), therefore, require the communication to be via the recipient's telephone or to be delivered to the recipient's home or person.[1] No provision is made in Section 42.07(a) for punishing acts not directed to a private recipient.

Both *Cohen* and *Rowan v. United States Post Office Department*, 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970), recognize the interest of the State in protecting the recipient's privacy within the house; the same considerations apply to the telephone and, a fortiori, to the person.

We find no constitutional infirmity in Section 42.07(a) as applied in this case.

■ Exception is taken to the trial court's refusal to shuffle the jury panel before the voir dire. The record shows that the panel was shuffled during the voir dire. No showing of harm to appellant is made or attempted. The error, if any, was harmless.

Appellant contends the failure of the court to define "annoy" and "alarm" or "coarse" and "offensive" in its charge to the jury was reversible error. Article 3.01, V.A.C.C.P., provides:

"All words, phrases and terms used in this Code are to be taken and understood

---

1. We do not imply that a communication could not be within the ambit of Section 42.07(a) if left, e. g., on complainant's desk at work rather than handed over directly; we mean only that the writing must be delivered to a place personal to the complainant.

in their usual acceptation in common language, except where specially defined."

The contention has no merit. *King v. State*, 553 S.W.2d 105 (Tex.Cr.App.1977).

■ Appellant contends that prosecution's statement during final argument to the jury that "[i]f you want to sentence John and Anne Keiser to a lifetime of Shirley Kramer, then you find her not guilty" was so prejudicial that the court's instruction to the jury to disregard the statement was insufficient to prevent irreparable harm to appellant. Error, if any, was made harmless by the court's instruction.

Appellant's final contention is that the court erred in admitting State's Exhibit No. 1, the postcard with the complained of message, into evidence because it varied from the version set out in the information in that it had an address—that of John Keiser—upon the obverse side while only the reverse was shown in the information. In *Fischer v. State*, 172 Tex.Cr.R. 592, 361 S.W.2d 395 (1962), this Court said:

> "Appellant next complains of the admission of the letter in evidence over the objection of a variance because the letter contained more words, phrases, and language than the quoted phrases in the information. We find no error in admitting the letter in evidence, as the quoted phrases set out in the information were exactly as contained in the letter. The burden was upon the state to prove that the letter was written and sent. In making such proof, the entire letter was admissible, although it was not necessary to set out the letter in its entirety in the information. *Bradfield v. State*, supra. [73 Tex.Cr.R. 353, 166 S.W. 734]" 361 S.W.2d at 397.

Appellant's contention is without merit.

The State's motion for rehearing is granted. The reversal is set aside; the judgment is now affirmed.

1. "(a) A person commits an offense if he intentionally:
    "(1) communicates by telephone or in writing in vulgar, profane, obscene, or indecent language or in a coarse and offensive manner

## DISSENTING OPINION ON STATE'S MOTION FOR REHEARING

ROBERTS, Judge, dissenting.

### I.

The court says that "the gravamen of the violation of Section 42.07(a) as charged in the information is the *intent* to annoy and alarm by means of a 'coarse and offensive' message." It is ironic that the trial court's charge in this case permitted the jury to convict on lesser proof than that, a fundamental error which requires reversal.

A prosecution under Section 42.07(a)(1) [1] requires proof of two culpable mental states: (1) A person must have *intentionally* communicated, and (2) he must have either (a) *intended* to annoy or alarm the recipient or (b) *intentionally, knowingly, or recklessly* annoyed or alarmed the recipient.

The information in this case alleged that the appellant

> "did unlawfully knowingly and intentionally communicate in writing in a coarse and offensive manner with another, namely; ANNE KEISER, and by this action did intend to annoy and alarm and did annoy and alarm the said ANNE KEISER, the recipient . . . ."

The allegation "knowingly . . . communicate" is anomalous since such conduct is not an offense. This does not make the information defective, but it is a portent of error to come in the charge. The allegation, "did intend to annoy and alarm and did annoy and alarm," has at best only one culpable mental state: intent; there is no allegation of knowingly (or recklessly) annoying and alarming.

The court's charge to the jury was (emphasis supplied):

"MEMBERS OF THE JURY:

"The Defendant, Shirley Kramer, is charged with the offense of harassment, and by this action intentionally, knowingly, or recklessly annoys or alarms the recipient or intends to annoy or alarm the recipient . . . ."

alleged to have been committed in Dallas County, Texas, on or about the 31st day of December, 1975. To this charge the Defendant has pleaded not guilty.

"I now give you the law that applies to this case:

"A person commits the offense of harassment if he intentionally communicates in writing in a coarse and offensive manner and by this action intentionally or knowingly annoys or alarms the recipient.

[Statutory definitions of 'intentionally' and 'knowingly' were given.]

"Therefore, if you believe from the evidence beyond a reasonable doubt that the Defendant, Shirley Kramer, did, in Dallas County, Texas, on or about the 31st day of December, 1975, *knowingly or* intentionally communicate in writing in a coarse and offensive manner, to–wit:

**Baby Problem Solved!**
**— with this beautiful**
**ALL METAL**
CASKET-VAULT COMBINATION
**CRYPT a CRIB**
P.O. Box 11074
Cincinnati, Ohio 45211

and by such action intentionally *or knowingly* annoyed or alarmed the recipient, Ann Keiser, you will find the Defendant guilty.

"If you do not so believe, or if you have a reasonable doubt thereof, then you will find the Defendant not guilty."

It will be noted that the jury was authorized to convict if the appellant knowingly communicated, which is not an offense, for only intentionally communicating is proscribed; and the jury was authorized to convict if the appellant knowingly annoyed or alarmed the recipient, which was not alleged in the information. Charges that authorize conviction on culpable mental states that do not constitute an offense, or which were not alleged in the pleading, or both, are fundamentally defective. *Hutchins v. State*, 590 S.W.2d 710 (Tex.Cr.App. 1979). *See generally Sattiewhite v. State*, 600 S.W.2d 277 (Tex.Cr.App.1980); *Cumbie v. State*, 578 S.W.2d 732 (Tex.Cr.App.1979).

In cases of this type we have not required a showing of harm, although some members of the court would impose such a requirement. *See, e. g., Dowden v. State*, 537 S.W.2d 5 (Tex.Cr.App.1976). If a showing of harm were required before we would reverse, it would be apparent in this case. The communication was not addressed to Anne Keiser, who was alleged to be the recipient; it was addressed to her husband John Keiser. The jury easily could have believed that the appellant only intended to communicate with John or to annoy John, but that she knew that she would communicate with or annoy Anne. Such a state of facts would not constitute the offense which was alleged by the State in this information, yet the jury was authorized to convict on it.

The charge reflects fundamental, reversible error. The court has not even addressed it.

II.

The panel was correct in holding that there was no evidence of communication "in a coarse . . . manner," although its explanation of the meaning of that phrase was not exactly correct. The history of the phrase demonstrates that "coarse" describes, and must have been intended by the Legislature to describe, what might colloquially be called dirty language. Only by ignoring this history can the court conclude otherwise.

The antecedent of the present harassment statute was Article 476 of the old Penal Code (1965 Texas General Laws, chapter 575), which made it an offense to use "any vulgar, profane, obscene, or inde-

cent language over or through any telephone." Obviously, this statute dealt with dirty language.

To replace the old term "vulgar, profane, obscene, or indecent language," the drafters of the new Penal Code chose the term "coarse and obviously offensive manner."[2] The drafters made it clear that "coarse" refers to dirty language:

> "The terms 'coarse and obviously offensive' seemed to the committee as precise as the nature of this offense permits. * * * (The committee preferred the term 'coarse' to terms such as obscene, lewd, profane, and indecent, because this term, unlike the others, is devoid of archaic overtones that clutter, rather than clarify, its meaning.)"

State Bar of Texas, *Texas Penal Code: A Proposed Revision* 292 (Final Draft 1970). The drafters also indicated that they intended no change in the scope of the harassment law, which (as we have noted) punished dirty language:

> "This section, which is concerned primarily with obscene and harassing telephone calls, *changes Penal Code art. 476 in only one respect.* It does not punish the use of 'vulgar, profane, obscene, or indecent language' over a telephone unless this language is likely to annoy or alarm the recipient. In the committee's view, the morality of persons who choose to communicate with each other in crude language over the telephone should not be the concern of the criminal law."

*Id.* at 300 (emphasis supplied).

The drafters expressly acknowledged (*Id.* at 291–292, 300) their reliance on the Model Penal Code's harassment and disorderly conduct statutes, which use the term "offensively coarse." Therefore it is useful to consult the comment in American Law Institute, *Model Penal Code: Tentative Draft No. 13* 6 (1961) (footnotes omitted):

> "It is not easy to select terms which will cover such unjustified public annoyances while safeguarding the right to say unpopular things. * * * Public 'profanity' is frequently penalized by statute or ordinance, but the Advisory Committee believed that this term came too close to making 'sacrilege' criminal. 'Indecent' is either too narrow, if it be thought to be limited to the obscene, or possibly unconstitutionally vague if not so limited. The word 'coarse' suggested in clause (b) makes it clear that we intend to include scatology as well as obscenity, ... although it is impossible to specify precisely the degree of shocking impropriety of language required...."

Although the term "in a coarse and obviously offensive manner" was intended to replace the term "vulgar, profane, obscene, or indecent language," the Legislature saw fit to include in the harassment statute both the old term and the new term "in a coarse and offensive manner." S. Searcy & J. Patterson, in "Practice Commentary," 4 *Vernon's Texas Codes Annotated: Penal Code* 168 (1973), suggest that the Legislature apparently forgot to delete the new term. This seems unlikely, since the Legislature paid enough attention to the term to delete the word "obviously." Perhaps the Legislature was cautious enough to retain an old term of proved validity[3] in case the new term failed to pass constitutional muster.

At any rate, the history makes it clear that "coarse" refers to dirty language. In a prosecution such as this one for communicating "in a coarse and offensive manner," there must be proof that the communica-

---

**2.** The draft version of section 42.07(a)(1) in *Texas Penal Code: A Proposed Revision* (Final Draft 1970) was:

"(a) An individual or corporation commits an offense if he intentionally:

"(1) communicates by telephone or in writing in a coarse and obviously offensive man-

ner, and by this action intentionally, knowingly, or recklessly annoys or alarms the recipient; ...."

**3.** The constitutionality of the old term had been upheld in, *e. g.*, *Schuster v. State*, 450 S.W.2d 616 (Tex.Cr.App.1970).

tion was both coarse and offensive. If any history beyond the plain language of the statute be needed, the drafters of the term may be quoted in their comment to the disorderly conduct statute (which included the same term):

"In the committee's view, it would have been inappropriate to prohibit all 'offensive' utterances in a public place, since that term might have been construed to prohibit the expression of offensive ideas, a constitutionally protected activity. * * Similarly, in the committee's opinion, it would have been inappropriate to prohibit all 'coarse' utterances in a public place, since coarse language is not offensive in certain social contexts. The two operative terms therefore limit each other. An utterance, gesture, or display must be *both* coarse and obviously offensive before it can be punished."

State Bar of Texas, *Texas Penal Code: A Proposed Revision* 292 (Final Draft 1970). *Accord*, American Law Institute, *Model Penal Code: Proposed Official Draft* 224 (1962) ("Offensively" was added; " 'Coarse' alone is insufficient since in many groups and settings coarse language is not offensive to the hearers.").

In this case, the communication of the Crypt–a–Crib advertisement may have been offensive to Anne Keiser. It may have been a spite message, as the court says. But it was not coarse–dirty—and therefore it did not fall within the ambit of the statute. As a matter of state law, the proof has failed to show an offense. The court should direct the entry of a judgment of acquittal.

The Code Construction Act (Texas Revised Civil Statutes Article 5429b–2) provides that we may consider legislative history (Sec. 3.03), and that words that have acquired a particular meaning, whether by legislative definition or otherwise, shall be construed accordingly (Sec. 2.01). These sections of the Code Construction Act have been made specifically applicable to the Penal Code. V.T.C.A., Penal Code, Section 1.05(b). The court unaccountably ignores these statutes. Astonishingly it turns to a statute that is not even applicable: Article 3.01 of the Code of Criminal Procedure, which by its own terms applies only to, "All words, phrases and terms *used in this Code* ...." The term in question appears in the Penal Code, not in the Code of Criminal Procedure.

Even by its own, inapplicable terms, Article 3.01 cannot carry the day for the majority. It requires words "to be taken and understood in their usual acceptation in common language." What does "coarse" mean, according to the court? The only hint of an answer is the court's statement that, "The instant case is precisely the situation where the alternative of a 'coarse and offensive manner' is necessary to vindicate the rights of the recipient of spite messages and the State's interest in protecting citizens from such intrusion." "Coarse," then, must mean "spiteful"; we are to believe that the usual acceptation of "coarse" in common language is "spiteful."

III.

The Code Construction Act, Section 3.01(1), creates a presumption that the Legislature intended to enact a statute that was in compliance with the United States Constitution. By its construction the court could have saved this statute, but it has chosen to make the statute vague and overbroad.

I begin with a word about *stare decisis* in this area. The court disposes of the contentions that "coarse," "offensive," "annoy," and "alarm" are vague by citing *Collection Consultants, Inc. v. State*, 556 S.W.2d 787 (Tex.Cr.App.1977). That case purported to hold that "annoy" and "alarm" are not vague, but it never actually addressed the issue. The opinion did two things. First, it quoted in full the opinion in *Schuster v. State*, 450 S.W.2d 616 (Tex.Cr.App.1970):

"In her sole ground of error appellant challenges the constitutionality of Article 476, supra.

"In *Alobaidi v. State*, Tex.Cr.App., 433 S.W.2d 440, this Court in an opinion by Presiding Judge Woodley upheld the constitutionality of said statute. We adhere to that decision. See also *LeBlanc v. State*, Tex.Cr.App., 441 S.W.2d 847. As we view it, such statute is not violative of the First Amendment, United States Constitution or Article I, Sec. 8, Texas Constitution, Vernon's Ann.St."

*Collection Consultants'* reliance on *Schuster* is a non sequitur; vagueness is a Fourteenth Amendment (due process) problem which is not disposed of by a First Amendment case.

The second thing that *Collection Consultants* did was to cite *LeBlanc v. State*, 441 S.W.2d 847 (Tex.Cr.App.1969), a case which is another non sequitur. The entirety of its holding was (441 S.W.2d at 851):

"The remaining ground for reversal presents the contention that Art. 476 V.A.C.P., defining the offense charged in the complaint and information, is void because too vague and indefinite.

"The constitutionality of Art. 476, supra, was upheld by this court in *Alobaidi v. State*, Tex.Cr.App., 433 S.W.2d 440."

*Alobaidi* had nothing to do with vagueness; the only question was whether there could be a statutory exception for business calls.

In other words, this Court's only response to vagueness attacks on this statute and its predecessor has been to cite irrelevant cases without further discussion. The unspoken principle behind this method of deciding cases is that, if one kind of constitutional attack on a statute has been rejected, all other kinds of constitutional attacks can be rejected without discussion. *Stare decisis* does not operate in this fashion. *See* Comment, "The Texas Harassment Statute," 17 S.Tex.L.J. 283, 294–295 (1976). Instead of continuing this illogical analysis (or lack of analysis) today, the court should take up the merits of the vagueness contention.

The court also avoids the vagueness question by refuting an argument that the ap-

pellant did not make, while ignoring the one he did make. The appellant does *not* argue that "any recipient of a message may decide what that recipient thinks is 'coarse or offensive.'" Majority Opinion at 866. His argument is that, "This particular statute fails to advise what will constitute an offense for it leaves the question of whether or not an offense is committed up to *the annoyance or alarm* of the recipient." Appellant's brief at 7 (emphasis supplied). The appellant expressly relies on the same argument made by Prof. Steele in "The Impact of the New Penal Code on First Amendment Freedoms," 38 Texas Bar Journal, 245, 253 (1975):

"In addition to the obvious First Amendment difficulties, Section 42.07 looks like a textbook case of vagueness and overbreadth. Section 42.07 requires that the recipient of the communication be annoyed or alarmed. But the only manner in which the recipient's annoyance can be known is by the recipient's statement to that effect. Every person has his own unique scale of annoyance, and accurate determination of that scale is impossible to judge."

This was the problem that afflicted the ordinance in *Coates v. City of Cincinnati*, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971). The ordinance made it an offense for three or more persons to assemble on a sidewalk, etc., "and there conduct themselves in a manner annoying to persons passing by, or occupants of adjacent buildings." Just as this court does today, the Ohio Supreme Court held that, "The word 'annoying' is a widely used and well understood word; it is not necessary to guess its meaning. * * * [T]he standard of conduct which it specifies is not dependent upon each complainant's sensitivity...." *City of Cincinnati v. Coates*, 21 Ohio St. 66, 69, 255 N.E.2d 247, 249 (1970). In holding that the statute was unconstitutionally vague, the Supreme Court said (402 U.S. at 613–614, 91 S.Ct. at 1688) (footnote omitted):

"But the court did not indicate upon whose sensitivity a violation does depend—the sensitivity of the judge or jury, the sensitivity of the arresting officer, or the sensitivity of a hypothetical reasonable man.

"We are thus relegated, at best, to the words of the ordinance itself. If three or more people meet together on a sidewalk or street corner, they must conduct themselves so as not to annoy any police officer or other person who should happen to pass by. In our opinion this ordinance is unconstitutionally vague because it subjects the exercise of the right of assembly to an unascertainable standard, and unconstitutionally broad because it authorizes the punishment of constitutionally protected conduct.

"Conduct that annoys some people does not annoy others. Thus, the ordinance is vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all. As a result, 'men of common intelligence must necessarily guess at its meaning.' *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322."

By a pointed comparison (402 U.S. 613 n. 3, 91 S.Ct. 1687) to *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), where a statute that punished "offensive, derisive or annoying" words was upheld because the state court had given it a limited definition, the Supreme Court showed that the Ohio court had abnegated its responsibility to construe the ordinance in a constitutional way. Today our court does exactly the same thing by refusing to set a standard for "annoy" and "alarm."[4]

"Coarse" is also left vague. If it can mean "spiteful," who knows what else it can mean? People of common intelligence must necessarily guess at its meaning, and the job of guessing has been made harder today.

Aside from being vague, the statute is grossly overbroad. A statute is void for overbreadth if "it offends the constitutional principle that 'a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected [First Amendment] freedoms.'" *Zwickler v. Koota*, 389 U.S. 241, 250, 88 S.Ct. 391, 396, 19 L.Ed.2d 444 (1967).

The court cures one overbreadth problem by construing the term "writing" to mean "writing . . . in the nature of a letter or personal message." The spectre of publishers of books, magazines, newspapers, handbills, and signs being prosecuted evidently was too much for the court.

But letters and personal messages are speech, and the freedom to write them is protected by our constitutions—or it was until today. By taking this statute outside the realm of dirty language, and by refusing to put any definitional limitation on its operative words, the court literally has made it an offense to send anyone an annoying or alarming letter. It should go without saying that the First Amendment protects even annoying and alarming speech.

"The right of freedom of speech and press has broad scope. The authors of the First Amendment knew that novel and unconventional ideas might disturb the complacent, but they chose to encourage a freedom which they believed essential if vigorous enlightenment was ever to triumph over slothful ignorance."

*Martin v. City of Struthers*, 319 U.S. 141, 143, 63 S.Ct. 862, 863, 87 L.Ed. 1313 (1943) (footnote omitted). It is that right on which this statute intrudes. As Prof. Steele has remarked, "[T]he Harassment section is so broad that it includes callers [and writers] who have every right and reason to intentionally and knowingly annoy or alarm the recipient. . . ." 38 Texas Bar Journal at 253 (1975).

---

4. The term "offensive" may be said to be vague for much the same reason; offensive to whom?

The point is not that the appellant has a right to continue bothering the Keisers.[5] The point is that in order to punish this appellant for her bizarre activities the court has broadened the statute into an area of speech that is protected by the First Amendment. After today's decision, for example, anyone who writes a letter to a public official in vigorous disagreement with the official's performance of his duties is subject to being jailed.[6] So are the operators of charities who intentionally mail out alarming pictures of starving Asian orphans in order to raise funds. So are anti-abortion propagandists who mail alarming pictures of aborted fetuses. Any of these letters could be deemed "coarse and offensive" under today's decision.

The court finds a "constitutional" basis for this by misinterpreting *Rowan v. United States Post Office Dep't*, 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970). *Rowan* held that the First Amendment was not offended by a statutory scheme which required mailers of advertisements to remove from their mailing lists the names of recipients who notified the Post Office that they objected to the advertisements. The statute did not make it a crime to send such an advertisement, nor would the Constitution have tolerated such a statute. This is made clear by an opinion on which the *Rowan* court relied: *Martin v. City of Struthers*, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943). There the petitioner was convicted of violating an ordinance which forbade the act of summoning a resident to his door (as by knocking) for the purpose of giving him

an advertisement. Going door-to-door with handbills is an activity which is protected by the First Amendment, and the court held that the city could not punish it. The court said that a city could only punish those who called at a home in defiance of the previously expressed will of the occupant. 319 U.S. at 148, 63 S.Ct. at 865. *Rowan* does not authorize a state to punish protected speech if it is sent to a home, as the court holds today. *Rowan* and *Martin* stand for the proposition that a householder can keep unwanted speech out of his home by giving notice of his desire; the right to receive speech is personal to the recipient.[7]

The court's misunderstanding of this doctrine is manifested in its misapplication of *Rowan* and *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). The court holds that this statute is not overbroad because the First Amendment freedom of speech may not intrude into the sanctuary of the home. It quotes *Cohen* at length to demonstrate that a person's right to privacy (including the right to be free from unwelcome speech) is great when he is at home; the right is less compelling when he goes into the courthouse and is even less compelling in Central Park. *Rowan* likened this concept of privacy to the law of trespass; one may keep speech from intruding into the home. The right of privacy varies with the circumstances into which one puts himself.

The court turns this concept on its head by declaring that "the same considerations [of *Cohen* and *Rowan*] apply . . . , a fortiori, to the person." That is, the right of priva-

---

5. See note 7, infra. The appellant has standing to raise overbreadth arguments that do not apply to the facts of her case because we want to avoid the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application. *Bigelow v. Virginia*, 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975).

6. Chief Justice Ellett of the Utah Supreme Court would certainly be hesitant about circulating copies of his opinion in *Salt Lake City v. Piepenburg*, 571 P.2d 1299 (1977), wherein he implied that some of his fellow justices were "depraved, mentally deficient, mind-warped

queers" who should be impeached. Our mail occasionally brings us similar diatribes from some (usually anonymous) members of the public, but I would not have thought before today that they could be jailed for writing their views.

7. For this reason the Keisers, by injunction or peace bond, could stop the appellant from sending them mail. Why a prosecutor would have brought this prosecution into a private dispute is puzzling.

cy in the sanctuary of the home applies more strongly (*a fortiori*) to the person; a person has more privacy right *as a person* to be free from unwelcome speech than he has in his home. This is the opposite of what *Cohen* and *Rowen* held. The court, which began its argument by saying that the right of privacy in the sanctuary of the home saved this statute from overbreadth, ends by holding that the right of privacy is in the person rather than the home.

The insidious thing about this non sequitur is that the court goes on to say that prosecution may be had for writings "delivered to the recipient's home *or person.*" Therefore this statute, which is supposed to be free from overbreadth because it protects the sanctuary of the home, may also be used to prosecute writings delivered to the person. And that is every written message, for there is no way to deliver a writing other than to the person.[8] The "sanctuary of the home" justification completely disappears in the course of the holding.

If we gave proper consideration to the vagueness and overbreadth questions, we would hold that "coarse" involves dirty language and that "offensive," "annoying" and "alarming" must be judged by the standards of a reasonable person. If we did so, we might save this statute. As it is we sanction an intrusion on free speech and we practically invite a federal court (which would respect any correct constitutional construction that we gave it; *see, e. g., Colten v. Kentucky*, 407 U.S. 104, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972)) to strike it down as void on its face. Then the citizens of Texas will have no protection from obscene telephone calls, which is the real purpose of this statute. Let them not then place the blame on the federal court, for it will belong here.

PHILLIPS, J., joins in this dissent.

CLINTON, Judge, dissenting.

That the statute before us is at once impermissibly vague and overbroad on its face is manifest. Patent ambiguity of the statute is revealed by the varying interpretations and competing constructions of phrases in the opinions of the majority and of Judge Roberts' dissent. Similarly, they hypothesize limiting considerations or expansive applications that serve to demonstrate its overbreadth. Needless to elaborate, vagueness and overbreadth in a penal proscription that implicates communication soon erode fundamental freedoms which thrive on discourse. The Court should hold the statute unconstitutional, and be done with its threats to society. See *State v. Blair*, Ore., 601 P.2d 766, 26 CrL 2331 (1979), holding an harassment by communication statute invalid.

Refusing to do so, the majority will rue this day it carries. So preoccupied with denouncing what it sees as a communication motivated by spite,[1] the majority tortures statutory terms such that "manner" is turned into a state of mind.[2] Assuming *arguendo* that the statute may be constitutionally applied, the majority's gloss rules out many conceivable "coarse and offensive" ways of acting–the acceptable meaning of "manner"–that are not motivated by spite or other ill feeling. To twist behavior into attitude in order to uphold this conviction is, in my view, to create a dangerous precedent.

Yet, the dissenting opinion by our brother Roberts, admirable for its penetrating re-

---

8. By a footnote the court says the writing may be "delivered to a place personal to the complainant." But if the *Cohen* rationale applies *a fortiori* to the person than to his house, then every place he happens to be is *a fortiori* a place more personal to him than his house.

1. Since "spite" is usually a noun, sometimes a verb but never an adjective, the meaning intended by the majority in characterizing the clipped advertisement at issue as a "spite message" is far from clear to me, but my interpretation surely is close to the mark: a message that is spitefully sent.

2. By definition "spite" is a mean or evil feeling toward another, petty ill will or hatred–a mental attitude.

search into the history leading to legislative enactment of the statute, is not convincing in providing meaning to this same phrase.[3] To me, at least, it is not "clear that 'coarse' refers to dirty language."

The single sentence that states the offense in terms of communicating "in vulgar, profane, obscene, or indecent *language* or in a coarse and offensive *manner*"[4] belies the notion that an otherwise careful scrivener[5] used "manner" when he really meant "language." Rather, it would seem he intended that which wrote i. e., that one commits an offense, paraphrasing it as pertinent here,[6] when he communicates in writing in a coarse and offensive manner and thereby intends to or does annoy or alarm.

Given this interpretation of the key statutory term, I agree with Judge Roberts that the proof failed to show an offense was committed, for dispatching a clipped advertisement (that is itself published in exercise of commercial free speech)[7] affixed to a regular postcard is simply not communicating in a coarse and offensive manner—regardless of the spiteful attitude of its sender or the distressful reaction of its recipient. The majority errs egregiously in finding that an interest of the State of Texas advanced by this statute is "in protecting citizens . . . [against] . . . intrusion" from "spite messages," and compounds its error by upholding this conviction on the

theory that appellant intended to cause "distress." Whatever her intent, if she did not *act* in a manner proscribed by § 42.07(a)(1) she is not guilty of the offense charged. What the Court ends up approving is imposition of a criminal penalty for having a certain state of mind—"spite"—rather than for engaging in proscribed conduct.

As to the facial constitutionality of § 42.07(a)(1), what it penalizes is a communication by one of two means that in its content or manner is intended to or results in annoyance or alarm. The means are by telephone—speech—or by writing—press; the content must be "dirty" or the manner coarse and offensive. That these prescribed means and the described manner of communicating—"communicating," the very essence of the First Amendment and Article I, Section 8 of our Bill of Rights—may not be denied by law cannot be constitutionally disputed. Only when intended or actual consequence of communicating begins to become more conduct than speech is constitutional regulation permitted. Still, as made clear by the authoritative decisions of our courts, many of which are discussed and cited by Judge Roberts in Part III of his dissenting opinion, some citizens may and do communicate in a coarse and offensive manner intending all the while to annoy or alarm.[8] Criminalizing them is as unwise as it is unconstitutional.

3. The weakness of persuasion comes from its focusing on what the drafters of the earlier model penal code and the 1970 proposed revision of our penal code indicated *they* intended, rather than the history made in and by the Legislature tending to show its intent. Thus, we are left with a suggestion by the commentaries that the Legislature was forgetful and a thought by Judge Roberts that it was cautious (Dissenting opinion, page 870).

4. All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.

5. Judge Roberts remarks that the Legislature paid enough attention to the term to delete the word "obviously" in the phrase "a coarse and obviously offensive manner."

6. It was not alleged nor contended here by the State, as indeed it reasonably could not be, that the words of the published advertisement amount to "vulgar, profane, obscene, or indecent language." ˋ

7. *Bigelow v. Virginia*, 421 U.S. 809, 95ˑ S.Ct. 2222, 44 L.Ed.2d 600 (1975).

8. Members of the majority live in splendid isolation not to have pressed upon them the strident tract of political dissent, religious zealotry, charitable plea, insistent solicitation, and assorted exhortations and damnations—all in home or at front door. Annoying and aggravating though they be, the law need not still such expressions. In all good spirit I suggest the majority should recognize and acknowledge them by saying that in extending the former

I join in Part III, dissenting for reasons stated therein as well as here.

ONION, P. J., concurs in dissent.

proscription of harassment by telephone, the Legislature reached out and touched someone whose written expressions are constitutionally protected.