DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**JAMES THOMA,**
Appellant,

v.

**TAMEKIA O'NEAL,**
Appellee.

No. 4D14-3459

[December 9, 2015]

Appeal from the Circuit Court for the Nineteenth Judicial Circuit, St. Lucie County; Barbara W. Bronis, Judge; L.T. Case No. 562014DR001924.

Roger K. Gannam, Mathew D. Staver and Horatio G. Mihet of Liberty Counsel, Orlando, for appellant.

No brief filed for appellee.

CONNER, J.

Appellant, James Thoma, challenges the injunction entered against him for allegedly stalking the Victim. Thoma argues that the trial court erred in entering the injunction because (1) there was insufficient evidence of a course of conduct to support a finding of stalking, and (2) the conditions imposed by the trial court as part of the injunction were overly broad and thus unconstitutional as a restriction on Thoma's freedom of speech. We affirm the trial court's determination that there was sufficient evidence of a course of conduct to support a finding of stalking. We agree with Thoma that the conditions imposed by the trial court as part of the injunction were overly broad and infringed upon his First Amendment freedom of speech. However, the injunction has expired and that issue is moot. Thus, we affirm the trial court and write to address the first issue.

*Factual Background and Trial Court Proceedings*

The Victim's petition for an injunction for protection against stalking proceeded to an evidentiary final hearing. The Victim was an employee of an abortion clinic, and Thoma was a "sidewalk counselor" at the clinic, which he described as, "[w]hen women come in, we offer them alternatives

to abortion" and hand out literature. As support for her petition, the Victim testified about several encounters with Thoma as she walked from her car into the clinic during which Thoma made derogatory comments towards her. She also testified regarding an event where Thoma was in his car following her as she was driving home from the abortion clinic. After making several turns from her normal path to confirm Thoma was indeed following her, the Victim "ended up losing" him. She also testified about an incident a few weeks later in which she saw Thoma driving ahead of her into the residential community where she lived and he waved at her as she passed by him inside the community. Finally, the Victim testified about a flyer, a copy of which was attached to the petition. The flyer contained a picture of the Victim and stated at the top "Pray for [Victim's full name] [followed by Victim's picture] At [Victim's home address]" and stated at the bottom "Ask [Victim's full name] to please stop assisting the abortionist with the killing of black babies."[1] The Victim testified, without objection, that Thoma was seen passing the flyer out in the residential community where the Victim lived a few weeks after he waved at her as she passed him in her car. Shortly before Thoma was seen passing out the flyer, the Victim had moved her residence. Nonetheless, she received the flyer when it was forwarded to her from her old address. The one-page flyer was introduced into evidence.

In entering the injunction, the trial court explained on the record that a course of conduct constituting harassment as stalking was established by two instances: (1) the incident where the Victim saw Thoma following her in his car after leaving work, and (2) the flyer distributed by Thoma, which the trial court found "crosses the line" protected by the First Amendment. After determining the two incidents established a course of conduct showing harassment sufficient to constitute stalking, the trial court granted the injunction. Thoma timely gave notice of appeal.

*Appellate Analysis*

A trial court's order granting a permanent injunction is reviewed for competent substantial evidence. *McMath v. Biernacki*, 776 So. 2d 1039, 1040-41 (Fla. 1st DCA 2001). As for the portion of Thoma's argument that focuses on a violation of the First Amendment, appellate courts apply a de novo standard of review to determine whether a temporary injunction constitutes an unconstitutional prior restraint on free speech. *Gawker Media, LLC v. Bollea*, 129 So. 3d 1196, 1200 (Fla. 2d DCA 2014) (citation omitted).

---

[1] The Victim is an African-American female who worked at an abortion clinic described in the flyer as "located in a poor, black neighborhood."

Section 784.0485(1), Florida Statutes (2014), creates "a cause of action for an injunction for protection against stalking." § 784.0485, Fla. Stat. (2014). "A person who willfully, maliciously, and repeatedly follows, harasses, or cyberstalks another person commits the offense of stalking." § 784.048(2), Fla. Stat. (2014). To "harass" is defined as "engag[ing] in a course of conduct directed at a specific person which causes substantial emotional distress to that person and serves no legitimate purpose." § 784.048(1)(a), Fla. Stat. (2014).

Section 784.048(1)(b), Florida Statutes (2014), defines "course of conduct" as

> a pattern of conduct composed of a series of acts over a period of time, however short, which evidences a continuity of purpose. The terms does not include constitutionally protected activity such as picketing or other organized protests.

From this definition, Thoma makes two arguments on appeal: (1) the definition specifically excludes constitutionally protected activity such as protesting, and (2) there was no evidence of a "course of conduct," since there was only testimony regarding one incident of alleged following, *see also Chevaldina v. R.K./FL Mgmt., Inc.*, 133 So. 3d 1086, 1091 (Fla. 3d DCA 2014) ("Repeat violence is defined as two incidents of stalking or violence."). Both arguments are premised on the contention the flyer Thoma developed and distributed to the Victim's home was protected speech. We disagree that the flyer being sent to the Victim's home was protected speech and agree with the trial court that sending the flyer to the Victim's home was an incident of harassing behavior.

We begin with the observation that it is quite common, in trial court injunction proceedings seeking protection from stalking, that the petitioner is unrepresented by counsel, while the respondent is represented. As a result, as in this case, it is all too common on appeal that there is no answer brief on behalf of the successful petitioner defending the injunction.

Despite no answer brief defending the injunction, it appears, from the transcript of the hearing, there was sufficient circumstantial evidence to support a finding that Thoma followed the Victim home more than once in order to obtain her residence address; but, for whatever reason, the trial

3

court made findings as to only one incident of following the Victim.[2] So regarding the record of findings by the trial court, we are constrained to review the application of law to only two, instead of three, incidents of conduct articulated by the trial judge in finding a pattern of conduct constituting stalking behavior by Thoma. Clearly, the trial court's finding regarding one incident of following the Victim as harassing behavior is supported by substantial and competent evidence.

We agree with Thoma that the flyer is protected speech under the First Amendment, if one focuses on whether the flyer expresses a "true threat" of physical or emotional harm. Using current First Amendment case law analysis, it does not appear the flyer makes any veiled or direct threat of harm to the Victim, or encourages others to use violence against the Victim. But whether the flyer expresses a "true threat" is not the end of the First Amendment analysis.

In addition to having a picture of the Victim's face and giving the street address where she lives, the flyer contains racial slurs, suggesting the Victim, who is African-American, is working for the KKK at the abortion clinic.[3] Finally, the flyer ends with: "Ask [Victim] to please stop assisting the abortionist with the killing of black babies."

Although the flyer cannot be construed as a "true threat" of violence as that concept has been defined for First Amendment analysis, we agree, as the trial judge stated on the record, the flyer "crosses the line," in terms of First Amendment protection, because the mailing of the flyer to the Victim's home, by itself, was an attempt to force unwanted speech upon her in the privacy of her home.[4] Moreover, the flyer identifies the Victim by name and face, gives her residence address, and encourages people to approach her at home to deliver the message "stop engaging in abortions."

In *Operation Rescue v. Women's Health Center, Inc.*, 626 So. 2d 664 (Fla. 1993), our supreme court addressed, among other things, the issue of whether a permanent injunction against abortion protesters which prohibited, among other things, the protesters from picketing in front of the homes of employees of an abortion clinic.[5] *Id.* at 669. In upholding

---

[2] Appellate judges only have the benefit of transcripts and not the advantage of observing the demeanor of witnesses when testifying.

[3] The "KKK" stands for "Ku Klux Klan," a white supremacist organization.

[4] For purposes of engaging in harassment, the fact the Victim had moved from her former residence when the flyer was mailed is of no consequence.

[5] In *Madsen v. Women's Health Center, Inc.,* 512 U.S. 753, 774-775 (1994), the Supreme Court reversed the three hundred foot buffer around the residences, but upheld the right of municipalities to enact lesser distance restrictions against

that provision of the injunction, the supreme court relied upon *Frisby v. Schultz*, 487 U.S. 474 (1988), wherein the United States Supreme Court addressed the issue of picketers demonstrating outside the home of an abortion clinic doctor in violation of a city ordinance banning all residential picketing. *Id.* at 672. Our supreme court quoted the Court:

> Although in many locations, we expect individuals simply to avoid speech they do not want to hear, the home is different. "That we are often captives outside the sanctuary of the home and subject to objectionable speech . . . does not mean we must be captives everywhere." Instead, a special benefit of the privacy all citizens enjoy within their own walls, which the State may legislate to protect, is an ability to avoid intrusions. Thus, *we have repeatedly held that individuals are not required to welcome unwanted speech into their own homes and that the government may protect this freedom.*

*Id.* (quoting *Frisby*, 487 U.S. at 484–85) (emphasis added) (citations omitted).

In the context of a statute regarding postal delivery of speech, the Supreme Court noted, in *Rowan v. United States Post Office Department*, 397 U.S. 728, 738 (1970), a case quoted in *Frisby*, "the right of every person 'to be let alone' must be placed in the scales with the right of others to communicate." 397 U.S. at 737. The *Rowan* Court categorically rejected the argument that a vendor has a First Amendment right to send unwanted material into the home of another, saying:

> If this [statutory] prohibition operates to impede the flow of even valid ideas, the answer is that no one has a right to press even 'good' ideas on an unwilling recipient. That we are often 'captives' outside the sanctuary of the home and subject to objectionable speech and other sound does not mean we must be captives everywhere. The asserted right of a mailer, we repeat, stops at the outer boundary of every person's domain.

*Id.* at 738 (internal citations omitted).

Thus, our supreme court and the United States Supreme Court recognizes there is no First Amendment protection for speech that intrudes on the privacy of one's home. *See also State v. Elder*, 382 So. 2d 687, 692 (Fla. 1980) (noting that our supreme court and the United States Supreme

---

picketing in front of a person's home, and thus upheld the homeowner's right to privacy as superior to a protester's freedom of speech.

Court "have recognized that government may properly act in many situations to prohibit intrusion into the privacy of the home of unwelcome views and ideas which cannot be totally banned from the public dialogue," and, thus, "the privacy interest of a person may be accorded greater protection within the sanctum of the home or other private place than it may be accorded in the public forum") (citations omitted).

Because Thoma generated, mailed to the Victim, and distributed to her neighbors the flyer, which not only conveys a message he knew the Victim did not want to hear (and is a racial slur), but also clearly identifies the Victim by name and face, gives the reader her home address, and then invites the reader to dissuade the Victim from assisting in abortions, we are satisfied the flyer seeks to invade the privacy of the Victim's home, and the trial court properly determined the flyer was generated, mailed, and distributed with the intent to harass the Victim. Thoma's behavior with reference to the flyer and his attempt to push his message on to the Victim at her home is not protected by the First Amendment.[6] Thus, we uphold the trial court's finding that the Victim proved a course of conduct constituting stalking and was entitled to an injunction. Even though the scope of the injunction's prohibitions was too broad and constituted an invalid prior restraint on free speech as discussed in *Masden*, that issue is now moot because the injunction has expired.

*Affirmed.*

WARNER, J. and LEVEY COHEN, MARDI, Associate Judge, concur.

\* \* \*

**Not final until disposition of timely filed motion for rehearing.**

---

[6] The reasonable inference to be drawn from "At [Victim's home address]" in the flyer is to encourage other people to send written messages or to go to the Victim's home in an effort to encourage the Victim to quit working at the clinic. The fact the flyer was distributed in the Victim's residential community makes the attempt to invade the Victim's privacy more egregious, but that fact is not necessary to find there is no First Amendment protection.