DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**SCOTT JOHNSTONE,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D19-212

[June 17, 2020]

Appeal from the Circuit Court for the Nineteenth Judicial Circuit, St. Lucie County; Dan L. Vaughn, Judge; L.T. Case No. 562012CF002348 A.

Ashley Nicole Minton of Minton Law, P.A., Fort Pierce, for appellant.

Ashley Moody, Attorney General, Tallahassee, and Allan R. Geesey, Assistant Attorney General, West Palm Beach, for appellee.

FORST, J.

Determining whether an individual's behavior is merely boorish or juvenile as opposed to illegal stalking subject to criminal penalty can require the drawing of fine lines. Such is the case here, where the trial court found that Appellant Scott Johnstone had violated his probation by repeatedly harassing his neighbors over the course of nearly three years. Finding no abuse of discretion with respect to the court's revocation of probation, we affirm.

**Background**

Pursuant to a plea agreement, Appellant was convicted of ten counts of possession of child pornography and was jailed for less than a year. Upon release, he was placed on sex offender probation. Appellant moved to a house in a residential neighborhood. Shortly after this move, an antagonistic relationship developed between Appellant and the couple who lived next door to him (hereinafter, "the neighbors").

The discord began when Appellant came over to the neighbors' home to inform them of the child pornography convictions. In response, the male

neighbor told Appellant that his wife would not want to associate at all with Appellant in light of the child pornography convictions and later cautioned Appellant: "I'm serious, we can't do this anymore, ya' know we cannot communicate, we can't do this, so stay on your side, I'll stay where I'm at, everything will be fine." The male neighbor stood firm with his position despite Appellant's attempts to convince him otherwise.

According to the neighbors, after this encounter Appellant commenced a campaign of harassment against them. Appellant's "yard" was several acres. Appellant first moved his fence to the edge of his property line and removed tree limbs, which gave him a direct view of his neighbors' backyard. Over the next nearly three years, Appellant harassed the neighbors (and at times their young grandchildren) by committing the following acts:

- Appellant placed weeds, rocks, "chunks" of concrete taken from his pond, and tree limbs onto the neighbors' driveway, in their yard and in front of their mailbox.
- Appellant placed barbedwire on the fence adjoining the neighbors' property.
- Appellant placed empty paper bags on the fence posts, some of which would blow onto the neighbors' property.
- Appellant painted the side of his fence that faced the neighbors' property with obscenities ("f— you" and "a— holes"), a hand-painted picture of a clown-like character, and signs, including one that said "STUPID PEOPLE BEYOND THIS POINT" with an arrow pointing to the neighbors' property. Appellant's entire property was surrounded by the fence, but the only portion of the fence adorned with these "ornamentations" was the portion facing the neighbors' property. The remainder of the fence was not decorated.
- On several occasions when the neighbors' grandchildren or friends were in the neighbors' yard ("anytime [the neighbors] had people over"), Appellant would "burn fires" in his yard and then drive his lawnmower in such a way that the fire's ashes would blow onto the neighbors' property, by "park[ing] his mower on [the fire], leav[ing] [the mower] on top of [the fire] with the blades engaged . . . , with the output of the mower facing [the neighbors'] way . . . [and] just sit[ting] there and let[ting] it run for about 10 or 15 minutes until he got it stirred up . . . ." The fires were set within one hundred feet of the neighbors' house but

2

three to four hundred feet away from Appellant's house. The female neighbor testified that "he would always do it in, whenever the wind was blowing towards us so that the smoke would come over onto our property . . . [s]o anytime we were outside with our kids he was trying to chase us out, out of the yard."

- On three occasions when the neighbors' grade-schooler granddaughter was visiting, Appellant stood in his backyard, which faced the neighbors' property, wearing nothing but "whitey tighties," and "bathed" himself with soap and water from his hose.
- The neighbors' surveillance cameras captured footage of Appellant, on numerous occasions, walking back and forth in front of their property, including in the middle of the night.
- The final incident, which led to the neighbors' third protest to the police, occurred when the female neighbor was in the pool with her granddaughter. After the female neighbor and her granddaughter got in the pool, Appellant "walked up to the corner of [his] property . . . and stood there . . . staring at [the female neighbor and her granddaughter] in the pool" for ten minutes despite the female neighbor "yell[ing] for him to get the hell outta there."

On several occasions, the neighbors contacted the police, fire department (regarding the fires started in Appellant's backyard), and Appellant's probation officer to complain about the most recent act of harassment. The probation officer testified that in January 2018 she responded to two calls from the male neighbor and a call from another neighbor, both individuals complaining that Appellant was walking his dog on his neighbors' property. Appellant told the probation officer that he believed he was walking on an access road. The officer told him "to stop all this commotion it's best that you just stay away from them and so there won't be no violations, any other issues to stay away, stay, stay away from their property and there shouldn't be no problems."

A second officer testified that in October 2018, several days before Appellant's arrest, he responded to a call from the male neighbor. After speaking with the male neighbor, who recounted the incidents of harassment, the officer met with Appellant and asked him about the complaints of Appellant trespassing on the neighbors' property. The officer testified that Appellant claimed he was on common property, but "then he said well, truth be told I do [] these things to mess with [the male neighbor] because initially he had messed with [Appellant] first." Several days after

this meeting, Appellant was arrested and charged with stalking. In addition, the State also filed an affidavit of violation of probation, alleging that Appellant violated his probation by committing the offense of stalking.

The trial court found by a preponderance of the evidence that Appellant violated his probation by violating the condition requiring that Appellant "live without violating any law; conviction in a court of law is not necessary for such a violation of law to constitute a violation of . . . probation . . . ." In pronouncing its decision, the court noted that Appellant's actions, such as the signs on his fence, were targeted at the neighbors and their grandchildren and concluded that "[a]ll of this course of conduct in my view constitute harassment, it's malicious and repeated and serves no legitimate purpose."[1]  Appellant's probation was revoked, and he was sentenced to prison. This appeal followed.

**Analysis**

"[A] violation which triggers a revocation of probation must be both willful and substantial, and the willful and substantial nature of the violation must be supported by the greater weight of the evidence." *Jenkins v. State*, 963 So. 2d 311, 313 (Fla. 4th DCA 2007) (quoting *Steiner v. State*, 604 So. 2d 1265, 1267 (Fla. 4th DCA 1992)). "**The determination of whether a violation of probation is willful and substantial is a question of fact and will not be overturned on appeal unless the record shows that there is _no_ evidence to support it**." *Green v. State*, 23 So. 3d 820, 821 (Fla. 4th DCA 2009) (quoting *Jenkins*, 963 So. 2d at 313) (emphases added). "On appeal, the trial court's order is reviewed under an abuse of discretion standard." *Davis v. State*, 796 So. 2d 1222, 1225 (Fla. 4th DCA 2001).

The trial court determined that Appellant had violated section 784.048(2), Florida Statutes (2018), which provides in pertinent part that "[a] person who willfully, maliciously, and repeatedly . . . harasses . . . another person commits the offense of stalking, a misdemeanor of the first degree . . . ." The statute defines "harass" as "engag[ing] in a course of conduct directed at a specific person which causes substantial emotional distress to that person and serves no legitimate purpose." § 784.048(1)(a), Fla. Stat. (2018). The statute goes on to define "course of conduct" as "a pattern of conduct composed of a series of acts over a period of time, however short, which evidences a continuity of purpose. The term does

---

[1] While the trial court's oral finding discussed only these incidents, the decision was issued immediately following the trial and the court noted that the ruling "includes, but is not limited to these [] acts described by the testimony."

not include constitutionally protected activity such as picketing or other organized protests." § 784.048(1)(b), Fla. Stat. (2018). Thus, stalking requires the proof of a series of acts, willfully and maliciously directed at a specific person(s) and evidencing a continuity of purpose, which acts serve no legitimate purpose and cause substantial emotional distress to that person(s).

"Malicious behavior goes beyond intent to cause injury to include behavior that is 'without just cause or excuse.'" *Khan v. Deutschman*, 282 So. 3d 965, 968 (Fla. 1st DCA 2019) (quoting *Malicious*, Black's Law Dictionary (10th ed. 2014)). This court has held that "[t]aking the text of section 784.048(4) as a whole, and considering its context and the discernible purposes of the legislature, we conclude that the plain meaning of the statutory term maliciously is legal malice: i.e. 'wrongfully, intentionally, without legal justification.'" *Seese v. State*, 955 So. 2d 1145, 1149 (Fla. 4th DCA 2007).

"[S]talking is a series of actions that, when taken individually, may be perfectly legal." *T.B. v. State*, 990 So. 2d 651, 654 (Fla. 4th DCA 2008) (quoting *St. Fort v. State*, 943 So. 2d 314, 316 (Fla. 4th DCA 2006)). As such, even if Appellant's actions, when viewed *individually*, were all legal, this does not inexorably lead to a conclusion that the actions, taken collectively, would not qualify as stalking. *See id.*

The course of conduct must serve no legitimate purpose to constitute stalking. The term "legitimate" lacks a precise definition and must be evaluated on a case-by-case basis. *O'Neill v. Goodwin*, 195 So. 3d 411, 413 (Fla. 4th DCA 2016). "However, courts have generally held that contact is legitimate when there is a reason for the contact other than to harass the victim." *Id.*

The evidence clearly supports the trial court's finding that Appellant willfully engaged in "a pattern of conduct composed of a series of acts over a period of time" (here, a period of nearly three years), which "evidence[d] a continuity of purpose," and was "directed at" one or both of the neighbors. Shortly before his arrest, Appellant admitted to an investigating police officer that he "d[id] these things to mess with [the male neighbor]." Thus, by his own admission these acts were intentional, malicious, and served the purpose solely to harass his neighbors.

The trial court found the testimony of the neighbors to be credible with respect to Appellant's actions. A convicted sex offender on probation for possession of child pornography, he would stare at them from his fence when their granddaughter was in the pool, shower while wearing nothing

but his underpants in view of their granddaughter, blow ashes and smoke towards their yard when they had their grandchildren or friends over, and trespass by dumping debris on their driveway and in front of their mailbox. Appellant did not testify, and the court could infer from his failure to testify, as well as his statements to the officers as to his motive behind his behavior that he was harassing his neighbors within the meaning of the stalking statute. *See Watson v. State,* 388 So. 2d 15, 16 (Fla. 4th DCA 1980) ("[T]he court may properly infer non-compliance, and thus a violation of the condition of probation, from the probationer's silence.")

Appellant's pattern of conduct was "malicious," as it was "without just cause or excuse." And no "legitimate purpose" was served by any of the actions discussed above, in the manner they were performed. As distinct from the cases cited by Appellant and the dissent, this was not a "tit-for-tat" dispute between two neighbors. *Cf. Power v. Boyle,* 60 So. 3d 496, 499 (Fla. 1st DCA 2011) (finding that, inasmuch as the applicant for an injunction had threatened the defendant, the relationship between the two "is more tit-for-tat than stalker-victim"). This was a vendetta carried out by one individual against his neighbors and their minor grandchildren, due to no more than his apparent discontent that the neighbors did not want to associate with him after learning he was a convicted sex offender. Appellant admitted that his hostile actions were "to mess with [the male neighbor]," but he claimed that the male neighbor had "messed with him first." No explanation as to how the neighbor "messed" with Appellant was provided below.

Finally, Appellant claims that the State did not prove that his actions caused substantial emotional distress. When determining whether a defendant's conduct would cause "substantial emotional distress," courts apply a reasonable person standard. *Bouters v. State,* 659 So. 2d 235, 238 (Fla. 1995); *T.B.,* 990 So. 2d at 654-55 ("[T]he standard is that of a reasonable person in the same position as the victim."). To satisfy this prong of the stalking statute, the defendant's conduct must cause substantial emotional distress, which is greater than just an ordinary feeling of distress. *Shannon v. Smith,* 278 So. 3d 173, 175 (Fla. 1st DCA 2019). This court has explained that the "reasonable person standard is applied to a person in the position of the party," and "the standard is case specific." *David v. Textor,* 189 So. 3d 871, 876 n.1 (Fla. 4th DCA 2016).

"In determining whether an incident or series of incidents creates substantial emotional distress for a victim, the distress should be judged not on a subjective standard (was the victim in tears and terrified), but on an objective one (would a reasonable person be put in distress when subjected to such conduct?)." *D.L.D. v. State,* 815 So. 2d 746, 748 (Fla.

6

5th DCA 2002) (citing *McMath v. Biernacki*, 776 So. 2d 1039, 1041 (Fla. 1st DCA 2001)).

In the context of this case, with innocent parties subjected to a variety of unprovoked, malicious, and unrelenting forms of harassment over a period of nearly three years, we cannot say that the trial court lacked "any evidence" to find that a reasonable person in the same position as the victims, the neighbors, would be substantially distressed when subjected to this conduct. *See T.B.*, 990 So. 2d at 655 ("Obviously, many persons would not react in the same way as this victim; some might respond in kind, others might recall the old saying, 'sticks and stones may break my bones but names can never harm me,' others might respond with violence, but in each instance, it is likely to cause emotional upset.").

**Conclusion**

As set forth above, there was ample evidence to support the trial court's ruling. Appellant's individual acts over the course of nearly three years cannot be viewed in a vacuum. Although the dissent maintains "it takes two to tango" and argues that the trial court asserted itself into a "tit-for-tat" neighbor dispute, there is no evidence that the neighbors were anything other than victims to a continuing pattern of malicious and willful harassment directed their way with the sole purpose of "mess[ing] with [them]."

Appellant, an individual on sex offender probation was warned well in advance of his arrest "to stop all this commotion[,] it's best that you just stay away from [the neighbors] and so there won't be . . . violations, any other issues to stay away, stay, stay away from their property and there shouldn't be . . . problems." Notwithstanding this warning, Appellant persisted in his offensive and unwelcome conduct, directed at the neighbors for no legitimate purpose, causing substantial emotional distress.

Accordingly, we cannot say that the trial court, as the judge of the credibility of the witnesses (here, primarily the neighbors) and the finder of fact, abused its discretion in determining, by a preponderance of the evidence, that Appellant violated his probation. Thus, we affirm the trial court's order.

*Affirmed.*

WARNER, J., concurs.

7

KLINGENSMITH, J., dissents with opinion.

KLINGENSMITH, J., dissenting.

When one thinks of acts that constitute harassment, a few examples immediately come to mind: late-night hang-up calls; frequent unwelcomed visits to a workplace; multiple disturbing notes or mailings. *See, e.g., Thoma v. O'Neal*, 180 So. 3d 1157 (Fla. 4th DCA 2015). With the majority's opinion, we can now add garish fence painting, unproven property damage, and outdoor hose-rinsing to that list. As such, this case provides yet another illustration of the misuse of the stalking and harassment statutes. What the majority does today is ratify the use of this statute to punish people for engaging in petty annoying behavior in the context of a neighborhood dispute. While this is good news for Mr. and Mrs. Shockley because their problem was solved, it is bad news for our jurisprudence and everyone else because it marks the slide down a slippery slope. For that reason, I dissent.

At appellant's revocation hearing, the trial court heard from the Shockleys about appellant's various antics. The majority's opinion recounts many of them, including those which the trial court made no findings about. In fact, the court only made these specific findings of fact about appellant:

- Running a lawnmower over fire ashes and spreading fire ashes around so they blew over on the Shockleys' property had no legitimate purpose;
- Placing a sign on his own property that says "stupid people live here" served no legitimate purpose;
- Bathing or washing outside in underwear where appellant could be seen, even at quite a bit of a distance "in and of itself may be a little unusual, perhaps not illegal, but I can't come up with a legitimate purpose for that when other people are present";
- Painting the fence with clowns on it, knowing the grandchildren were present at the Shockleys' home, was directed at the Shockleys' home; it was not painted around any other area or directed at anyone else or the entire fence was not painted in that area. "I can't imagine no (sic) legitimate purpose for that";
- Bringing brush, debris, and cabbage palm trees and leaving it in front of or adjacent to the Shockleys' mailbox "in my view serves no legitimate purpose"; and

8

- Placing rocks or pieces of concrete in the roadway. Though no one saw appellant do it, "it's a reasonable conclusion based on the other behavior to conclude he would do that."

In making these findings, the trial court found persuasive that appellant told the deputy he was doing things "to mess with [the Shockleys]."[2] The trial court also found that *these* events were a course of conduct constituting harassment, that they were malicious, repeated, and served no legitimate purpose. Thereafter, the court revoked appellant's probation. So regarding the record of findings by the trial court, we are constrained to review the application of law to only those incidents of conduct articulated by the trial judge in finding a pattern of conduct constituting stalking behavior.[3] *See Thoma*, 180 So. 3d at 1160.

Under section 784.048(2), Florida Statutes (2018), "[a] person who willfully, maliciously, and repeatedly follows, harasses, or cyberstalks another person commits the offense of stalking . . . ." Further, the statute defines "harass" as a "means to engage in a course of conduct directed at a specific person which causes substantial emotional distress to that person and serves no legitimate purpose." § 784.048(1)(a). This statute specifically exempts constitutionally protected activities. *See* § 784.048(1)(b).

"[C]ourts have generally held that contact is legitimate when there is a reason for the contact other than to harass the victim." *O'Neill v. Goodwin*, 195 So. 3d 411, 413 (Fla. 2d DCA 2016). A finding of "no legitimate purpose" to a given action must not only comport with common sense, it must also be evidenced by a complete lack of usefulness or utility. *See David v. Textor*, 189 So. 3d 871, 875 (Fla. 4th DCA 2016) ("[W]hether a communication serves a legitimate purpose is broadly construed and will cover a wide variety of conduct."). The action complained of must be so entirely bereft of a valid purpose that the only possible reason to engage in such acts would be to cause substantial concern or distress to the

---

[2] This statement was made to the investigating officer after the Shockleys called the police when they saw appellant simply walking down a nearby access road or easement. This was the incident that precipitated appellant's arrest in this case.
[3] While the majority admits that the findings articulated in this dissent were the only ones made, the opinion nonetheless includes the Shockleys' other allegations to help bolster its holding, all because the trial court noted that its ruling "includes, but is not limited to these [] acts described by the testimony." However, that "catch-all" statement would not qualify as a finding of fact in any other case, and the majority fails to adequately explain why it should be deemed sufficient here.

intended target. The majority notes that appellant provided no explanation for some of these acts. Regardless, it is immaterial whether a defendant provides an explanation of purpose, or whether one of the purposes (in addition to any valid ones) is to "mess with" someone. Considering that the courts have defined malicious actions as those that are done "wrongfully, intentionally, [and] without legal justification," none of the actions allegedly engaged in by appellant met that definition. *See Seese v. State*, 955 So. 2d 1145, 1149 (Fla. 4th DCA 2007).

One example involves the cited act of appellant rinsing himself off outdoors with a hose. The trial court found this to be a "little unusual, perhaps not illegal" yet without any legitimate purpose when other people are present. The court erred in making such a finding. With all due respect to the trial court, there are many obvious legitimate purposes for doing this, the most patent of which is a desire to prevent tracking dirt from your body or from very soiled clothes into your house. Further, there was no evidence that appellant was aware he was being observed since he was quite a distance away from the Shockleys' house. Even if he did know the Shockleys were watching, standing outside on your own property rinsing off with a hose while wearing "underwear" as the Shockleys claim, or "shorts" as described by the investigating officer, is not even close to the type of conduct that falls within the stalking and harassment laws even if done in full view of others. If appellant violated no laws against nudity or lewd and lascivious behavior—and there is no suggestion that he did—the Shockleys' mere disdain at this behavior does not and cannot translate into a violation of the statute.

Apart from the alleged (and unproven) instance regarding the appearance of debris on the Shockleys' driveway which was attributed to appellant by suspicion and without evidence, all of the acts found by the trial court to fall within the scope of the statute were about appellant's actions on either his own property—property he is allowed to use for his own personal and lawful enjoyment—or places he had a legal right to be.

The evidence presented at the hearing was insufficient to establish that any acts, or series of temporally related acts, could combine with others to constitute stalking. In *Butler v. State*, 715 So. 2d 339, 341 (Fla. 4th DCA 1998), this court held that, like here, there was no testimony establishing a "series of acts" where defendant and alleged victim were involved in violent incidents on two occasions six months apart. Here, the State cannot aggregate six different types of acts—all occurring over the span of three years where repeated calls to law enforcement resulted in *no arrests, citations, or verified complaints*—to substantiate a stalking claim. While the Shockleys recounted several incidents diffusely spread out over that

timeframe, they are so dissimilar—and apart from the painted fence, unsustained—that they cannot be described as a "course of conduct." The only actions that appear to be repeated or sustained were the Shockleys' calls to law enforcement about appellant's behavior.

Last, and most importantly, although the trial court recognized its obligation to make a factual determination at the evidentiary hearing, it failed to do so on a critical point. The stalking statute requires the State to prove—and the court to make a finding—that the alleged victim or victims suffered "substantial emotional distress" under a reasonable person standard as a result of the acts alleged. A review of the record shows this issue was never addressed in the trial court's recitation of its factual findings. As the Fifth District explained in *D.L.D. v. State*, 815 So. 2d 746, 748 (Fla. 5th DCA 2002):

> [I]n determining whether an incident or series of incidents creates substantial emotional distress for a victim, the distress should be judged not on a subjective standard (was the victim in tears and terrified), but on an objective one (would a reasonable person be put in distress when subjected to such conduct?).

(citing *McMath v. Biernacki*, 776 So. 2d 1039, 1041 (Fla. 1st DCA 2001)). Under this standard, the focus is not on the Shockleys' subjective feelings, but rather, the reaction of a reasonable person in the Shockleys' shoes. *See T.B. v. State*, 990 So. 2d 651, 654-55 (Fla. 4th DCA 2008). The Shockleys did not testify that they experienced fear, anxiety or loss of sleep, nor did they seek counseling, increase security measures, or undertake any other acts consistent with or demonstrating substantial emotional distress. More importantly, the court made no factual finding that they had. This too was error. *See Chevaldina v. R.K./FL Mgmt., Inc.*, 133 So. 3d 1086, 1092 (Fla. 3d DCA 2014) (trial court erred in failing to set forth factual findings justifying violation of stalking statute).

There was limited testimony at the hearing about any "substantial emotional distress" suffered by either Mr. or Mrs. Shockley, and the evidence was wholly insufficient for making such a finding. This is the most likely explanation for why the trial court failed to make any finding of fact on this issue: while the Shockleys were certainly upset and angered by appellant's conduct, it cannot be said that a reasonable person in their shoes would suffer *substantial* emotional distress.

For example, while the majority points to the installation of cameras at the Shockleys' home to bolster their view of the evidence, a point on which

the trial court did not make any findings, a closer read of the evidence suggests this was done as more of a way to gather evidence than for personal protection. In fact, nothing in the record suggests that appellant ever threatened the Shockleys with harm. Mere irritation, annoyance, embarrassment, exasperation, aggravation, and frustration, without more, does not equate to "substantial emotional distress." *See* § 784.048(1).

To satisfy this prong of the stalking statute, the court must find that the defendant's conduct caused distress which is greater than just an ordinary feeling of discomfort. *See Shannon v. Smith*, 278 So. 3d 173, 176 (Fla. 1st DCA 2019) ("[E]mbarrassment does not equate to substantial emotional distress"). That did not happen here. While the court expressed a legal conclusion that harassment had taken place, it was made without a factual determination regarding an important statutory element—even though the court made the required findings on all the others. Such a determination cannot merely be assumed or inferred. As a result, this deficiency in the court's findings of fact taints the trial court's ultimate legal conclusion and constitutes reversible error.

The majority has effectively given the Shockleys veto power over their neighbor's lawful but annoying behavior. Though the Shockleys' irritation with this "bad neighbor" is understandable, they are not entirely blameless in this situation. As with any neighborhood feud, whether it be the Hatfields and McCoys, or the Shockleys and Johnstones, pinpointing who is responsible for starting the tit-for-tat is difficult. But one thing is certain: it takes two to tango. The record makes clear that the Shockleys embarked on a campaign of lodging numerous complaints to both law enforcement and appellant's probation officer about appellant's irritating behavior with the clear intent to have his probation violated and send him back to prison.[4] No doubt these constant complaints stoked the fires of appellant's enmity and provoked his ill-feelings toward the Shockleys. In the end, the trial court did just what the Shockleys wanted all along: it had appellant removed from the neighborhood and returned to jail. With the help of law enforcement and a cooperative probation officer, their plan worked.

---

[4] At the revocation hearing, the Shockleys testified about several complaints they lodged with law enforcement and admitted that getting appellant's probation revoked was their goal. The majority's attempt to solely pin the dispute on appellant is belied by the record. In doing so, the majority ignores the numerous, repeated, and dubious complaints the Shockleys called in to law enforcement over the years which, "includes, but is not limited to" their complaint about appellant walking down the easement road, as well as their complaint about appellant building a carport on his property.

A similar plan that follows the majority's newly ratified blueprint may also work in future disputes. Because the majority has now approved the use of the stalking statute to tilt the scales in relatively minor neighborhood quarrels, thus raising unsociable behavior to the level of unlawful harassment, I have no doubt that a future community combatant will use this case as support for securing either an injunction or an arrest in another neighborhood fray. That is exactly what this court decried in *Klemple v. Gagliano*, 197 So. 3d 1283 (Fla. 4th DCA 2016), where we reversed an injunction entered in a case where two neighbors routinely engaged in uncivil behavior towards one another. There, we said that "[t]he statute does not allow the trial court to enter injunctions simply 'to keep the peace' between parties who, for whatever reason, are unable to get along and behave civilly towards each other.'" *Id.* at 1286 (quoting *Power v. Boyle*, 60 So. 3d 496, 498 (Fla. 1st DCA 2011)). Although no injunction was issued here, the Shockleys, law enforcement, appellant's probation officer, and the court nonetheless used this statute to do just that despite our admonition in *Klemple*. The majority's decision affirming that result in this case is a step toward eroding the limitation we set forth in *Klemple* and allows the stalking statute to now become an oft-used arrow in the quiver for feuding neighbors to aim at one another.

I recognize that in most cases the trial judge is in the better position to evaluate the tenor of the incidents described and may exercise a great deal of discretion in deciding matters of probation revocation. *See Zelaya v. State*, 87 So. 3d 1257, 1259 (Fla. 4th DCA 2012). But such revocations must have a sufficient legal *and factual* basis, and this record shows there was not. Unlike the majority, I would not elevate this neighborhood squabble into the ambit of section 784.048(2). The trial court erred in allowing the stalking statute to be used to regulate appellant's annoying but lawful behavior and in failing to make an appropriate finding of fact on a critical statutory requirement. For these reasons, I disagree with the result reached by the majority and would reverse the trial court's decision to revoke appellant's probation.

*        *        *

**Not final until disposition of timely filed motion for rehearing.**

13